*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0461p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CLEVELAND NATIONAL AIR SHOW, INC.,
                                                    *Petitioner,*

         *v.*                                                              No. 04-4089

UNITED STATES DEPARTMENT OF TRANSPORTATION,
FEDERAL AVIATION ADMINISTRATION, et al.,
                                                    *Respondents.*

---

On Petition for Review of an Order of the
Federal Aviation Administration.

Argued: September 23, 2005

Decided and Filed: December 1, 2005

Before: SILER and SUTTON, Circuit Judges; SHARP, District Judge.[*]

---

## COUNSEL

**ARGUED:** Jay Clinton Rice, GALLAGHER, SHARP, FULTON & NORMAN, Cleveland, Ohio, for Petitioner. John Koppel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Jay Clinton Rice, Timothy John Fitzgerald, Joseph W. Pappalardo, Colleen A. Mountcastle, GALLAGHER, SHARP, FULTON & NORMAN, Cleveland, Ohio, for Petitioner. John Koppel, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.

---

## OPINION

---

SUTTON, Circuit Judge. The Cleveland National Air Show challenges an order of the Federal Aviation Administration (FAA) denying its request for a waiver that would allow it to conduct its air show within a congressionally mandated no-fly zone surrounding Jacobs Field, the home of the Cleveland Indians. Because the FAA reasonably interpreted the waiver provision and because the Air Show's other challenges to the waiver decision are unconvincing, we affirm.

---

[*]The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

I.

A.

Congress has charged the FAA with "promot[ing] safe flight of civil aircraft in air commerce," 49 U.S.C. § 44701(a), and has granted it authority to prescribe "regulations and minimum standards for other practices, methods, and procedure[s] the Administrator finds necessary for safety in air commerce and national security," § 44701(a)(5). The Administrator also may enact regulations and orders without notice or formal rulemaking when "the Administrator is of the opinion that an emergency exists related to safety in air commerce and requires immediate action." § 46105(c).

One such emergency occurred on September 11, 2001. In response to the attacks on the Pentagon and World Trade Center, the FAA ordered the air traffic system shut down for all civil operations. When the FAA permitted flights to resume, it subjected them to enhanced security restrictions. On December 19, 2001, for example, the FAA issued Notice to Airmen 1/3353, which created no-fly zones over "any major professional or collegiate sporting event or any other major open air assembly of people unless authorized by [air traffic control]." At the same time, the FAA established procedures allowing pilots to seek waivers from the restrictions.

On September 27, 2002, the FAA issued Notice 2/0199, which superseded Notice 1/3353. The new regulation scaled back the number of no-fly zones, limiting them to "any stadium having a seating capacity of 30,000 or more in which a Major League Baseball, National Football League, NCAA Division One football, or major motor speedway event is occurring," and required pilots to observe no-fly zones from "one hour before . . . until one hour after the end of the event." Notice 2/0199. The Notice exempted local airport arrivals and departures in contact with air traffic control as well as Department of Defense, law enforcement and aeromedical flight operations. Once again, the FAA created a waiver procedure for pilots to seek an exemption from the no-fly zone.

On February 20, 2003, Congress entered the picture. Section 352(a) of the Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 420–21 (2003), required the Secretary of Transportation to keep the no-fly zones established by Notice 2/0199 in effect, to rescind all existing waivers and to grant new waivers only when the applicant fit within a listed exception. One of the exceptions allowed a waiver "for operational purposes of an event, stadium, or other venue, including (in the case of a sporting event) equipment or parts, transport of team members . . . to and from the event, stadium, or venue." § 352(a)(3)(B). At the same time, the statute said that the Secretary could modify § 352 after one year so long as the new standards provided "a level of security at least equivalent to that provided by the [statutory] waiver policy." § 352(b).

On March 6, 2003, in response to this legislation, the FAA issued Notice 3/1862, which superseded Notice 2/0199, provided the requisite no-fly-zone restrictions and included the required waiver provision.

On January 23, 2004, Congress returned to the topic in passing another appropriations act— Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 521, 118 Stat. 3, 343 (2004). As before, the act required the FAA to keep the sporting-event no-fly zones of Notice 2/0199 in effect. § 521(a)(1). This time, however, Congress required the no-fly zones over Walt Disney World and Disneyland, created by Notices 3/2122 and 3/2123 respectively, to be maintained and included a slightly modified waiver provision. *Id.* The new waiver provision again limited the FAA's authority to grant waivers, permitting it to do so only for narrow reasons, including "with respect to an event, stadium, or other venue . . . for operational purposes." § 521(a)(2)(B)(i). Unlike the former provision, the new one did not allow the FAA to modify the waiver procedure in one year. *See id.*

B.

On each Labor Day weekend since 1964, the Cleveland National Air Show has hosted an aerial demonstration along the shore of Lake Erie at Burke Lakefront Airport in Cleveland, featuring the United States Navy Blue Angels, the United States Air Force Thunderbirds and numerous other performers. To host this event, the Air Show has applied each year to the FAA for a "Certificate of Waiver or Authorization," which allows pilots to conduct operations that would otherwise violate FAA regulations such as the rules concerning speed and minimum altitude. Until August 2004, it appears that the Air Show received these certificates without incident or interruption.

On August 23, 2004, less than two weeks before Labor Day, the FAA responded to the Air Show's June request for a Certificate, granting it in the main but denying it for all flights on Friday, September 3, after 6:05 p.m. In explaining its partial denial, the FAA told the Air Show that the first pitch of a Cleveland Indians baseball game was scheduled for 7:05 p.m. that night, putting the no-fly zone established by Notice 2/0199 into effect.

A flurry of correspondence followed. On August 25, the Air Show sent a letter to the FAA contesting the denial. The same day, an FAA official sent the Air Show an e-mail indicating that the denial was "mandated by Congress." JA 64. On August 27, the FAA responded to the Air Show and again said that congressional law required it to deny all flights in the area after 6:05 p.m., Friday night. On August 29, the Air Show wrote another letter offering several reasons why the Indians game and air show could run concurrently. On August 30, during a phone conversation, the FAA granted the Certificate for flights during the Indians game but did so only with respect to Department of Defense aircraft. On August 31, the Air Show sent yet another letter contesting the FAA's interpretation. On September 1, two days before Labor Day, the Air Show wrote a fourth letter, again disputing the FAA's interpretation and again complaining that the denial would disrupt the air show. That same day, the Air Show acknowledged in a press release that "[a]fter many discussions and much analysis, we now agree that the FAA's hands are tied by this law." JA 89 (quotation omitted).

On September 2, the Air Show nonetheless filed a petition for review of the FAA order in this court and an emergency motion for a stay pending appeal. On September 3, the day of the show, this court denied the requested stay and later that day denied the Air Show's emergency motion for rehearing.

II.

Before reaching the merits of the Air Show's petition for review, we must assess whether we have authority to resolve this matter. Article III, § 2 of the Constitution gives us authority only to decide "cases" or "controversies," and a dispute that has become moot no longer satisfies that requirement. *See Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309 (6th Cir. 2004). Mootness occurs "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A dispute remains live when a litigant can point to a "governmental action or policy that has adversely affected and continues to affect a present interest," *Weinstein v. Bradford*, 423 U.S. 147, 148 (1975) (per curiam) (quotation omitted), or can establish that the issue at hand is "capable of repetition, yet evading review," *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). The "capable of repetition, yet evading review" exception applies when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein*, 423 U.S. at 149.

While the 2004 air show that sparked this litigation has come and gone, the disagreement between the Air Show and the FAA over the correct interpretation of the no-fly-zone waiver

provision is not moot. For one, the no-fly-zone policy "continues to affect a present interest" of the Air Show. *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 126 (1974). Not only did the agency's interpretation of the statute disrupt the Air Show's 2004 program, but it also currently interferes with the Air Show's ability to schedule future events. For over 40 years, the air show has taken place at Burke Lakefront Airport, which lies within the no-fly zone of Jacobs Field (the home of the Cleveland Indians) and of Browns Stadium (the home of the Cleveland Browns). If the Indians or the Browns happen to schedule a game during Labor Day weekend, the air show will be interrupted. Further complicating matters, NCAA Division One football teams sometimes play games in Cleveland Browns Stadium, presenting yet another obstacle to the Air Show. *See* University of Wisconsin Future Football Schedules (2005), *available at* http://www.uwbadgers.com/sport_news/fb/schedule/fb_schd.pdf (noting that on Sept. 2, 2006, a football game will be played between the University of Wisconsin and Bowling Green State University in Cleveland Browns stadium). Quite plausibly, an event could be scheduled in one stadium or the other every day of the three-day weekend, leaving multiple five-to-six-hour holes in the show's program. As in *Super Tire*, the agency's interpretation of the statute "is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning part[y]." 416 U.S. at 122.

The injury also satisfies both requirements of the capable-of-repetition-yet-evading-review exception. "[T]he challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration." *Weinstein*, 423 U.S. at 149. Some of the Air Show's most popular acts, like the Blue Angels, begin their booking during the September preceding the show. *See, e.g.*, http://www.blueangels.navy.mil/geninfo/faq.html#location. While Major League Baseball typically releases a tentative schedule during the fall that precedes opening day, the National Football League does not release its preseason schedule until the spring, well after the Air Show's acts have been booked. The spring release of the NFL's exhibition schedule leaves the Air Show just six months to bring litigation over the agency's interpretation to a conclusion—which neither is realistic nor gives the Air Show a full opportunity to present its case. Nor is there any reason to doubt that "the same complaining party would be subjected to the same action again." *Weinstein*, 423 U.S. at 149. Nothing indicates that the Air Show plans to change this 41-year tradition. Nothing indicates that the FAA will change its interpretation. And nothing indicates that professional baseball and football plan to take off the Labor Day weekend anytime soon. As each operative part of this controversy remains in place, the case is not moot.

III.

A.

In deciding whether to defer to the FAA's interpretation of § 521 of Public Law 108-199, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), tells us to consider two questions. Did Congress speak "directly [ ] to the precise question at issue"? And, if not, is the agency's interpretation "based on a permissible construction of the statute"? *Id*. at 843.

The question at hand, then, is whether Congress's waiver authorization for the "operational purposes" of "an event," *see* § 521(a)(2)(B)(i), permits the FAA to grant the Air Show a waiver—on the theory that the Air Show is "an event" and the aerial show amounts to the "operational purposes" of the event. In our view, Congress did not directly resolve the point in the Air Show's favor, and the FAA's denial of the waiver request turns on a reasonable interpretation of the statute.

With the passage of Public Law 108-199 in 2004, Congress generally prohibited the Secretary of Transportation from "grant[ing] any waivers or exemptions," § 521(a)(2), from "the restrictions imposed under Federal Aviation Administration Notices to Airmen FDC 3/2122, FDC

3/2123, and FDC 2/0199," § 521(a)(1). The first two Notices identified in the provision create no-fly zones over Walt Disney World and Disneyland, respectively, and the last one (Notice 2/0199) creates a no-fly zone over "any stadium having a seating capacity of 30,000 or more in which a Major League Baseball, National Football League, NCAA Division One football, or major motor speedway event is occurring." At the same time that the law created these no-fly zones and eliminated the agency's discretion to grant waivers for them, it established the following exceptions to the no-waiver rule:

> [W]ith respect to an event, stadium, or other venue: (i) for operational purposes; (ii) for the transport of team members, officials of the governing body, and immediate family members and guests of such team members and officials to and from such event, stadium, or venue; (iii) in the case of a sporting event, for the transport of equipment or parts to and from such sporting event; (iv) to permit a broadcast rights holder to provide broadcast coverage of such event, stadium, or venue; and (v) for safety and security purposes related to such event, stadium, or venue.

§ 521(a)(2)(B).

Pointing to the FAA's authorization to grant a waiver "with respect to an event, stadium, or other venue [ ] for operational purposes," § 521(a)(2)(B)(i), the Air Show argues that it is an "event" and that the FAA accordingly may grant a waiver request for the "operational purposes" of its event. But this reading is hardly a necessary one or even a sensible one. Read most naturally, the exception for the operational purposes of "an event, stadium, or other venue" refers to the same kind of event, stadium and venue mentioned in the no-fly zones. Otherwise, the provision would mean that the FAA could grant waivers for anything that could be characterized as an event—making the exception the rule and the rule the exception. Put another way, why spell out the specific type of event, stadium and venue eligible for no-fly-zone status, as Congress did in § 521 of the act, if the operational purposes of any other event may diminish, if not undo, the no-fly-zone rule? We can think of no good answer. Better, we think, to follow the more logical and traditional approach to this kind of legislation—that in order to be eligible for an exception to a rule one must first be covered by the rule. The Air Show of course is not covered by the rule. Confirming that only those events subject to no-fly zones appear to be eligible for operational-purpose waivers, the underlying restriction (Notice 2/0199) that Congress incorporated into its positive law characterizes the no-fly-zone areas as "events." The Air Show's interpretation also cuts against the grain of Congress's general post-9/11 directives in this area, which have simultaneously become more specific about the types of events covered by no-fly zones and become more restrictive about the eligibility for no-fly-zone waivers.

The Air Show attempts to fend off this conclusion with a number of arguments. Each is unconvincing. First, the Air Show contends that because the FAA's "interpretation was not made after a formal adjudication or notice-and-comment rulemaking, [ ] it does not warrant *Chevron*-style deference." Air Show Br. at 22. In *United States v. Mead Corp.*, 533 U.S. 218 (2001), however, the Supreme Court rejected this line of argument. While a formal process is one signal that an agency deserves *Chevron* deference, it is not the only one. "[T]he Court has recognized a variety of indicators that Congress would expect *Chevron* deference," *id*. at 237, which is why the absence of notice-and-comment rulemaking in *Mead* did "not decide the case," *id*. at 231. *See also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Services*, 125 S. Ct. 2688, 2712 (2005) (Breyer, J. concurring) (noting that "the existence of a formal rulemaking proceeding is neither a necessary nor a sufficient condition for according *Chevron* deference to an agency's interpretation of a statute"). Proving the point, the FAA has received *Chevron* deference in numerous cases that did not involve a formal adjudication or notice-and-comment rulemaking. *See Gustafson v. City of Lake Angelus*, 76 F.3d 778, 786 (6th Cir. 1996) (according *Chevron* deference to an FAA interpretation and noting that "[a]s a reviewing court, we must give great deference to the views of a federal agency with

regard to the scope of its authority"); *see also Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005) (according *Chevron* deference to the FAA's interpretation of a statute); *Town of Stratford, Connecticut v. FAA*, 285 F.3d 84, 90 (D.C. Cir. 2002) (same).

Second, the Air Show contends that under the FAA's interpretation, "event" and "stadium" would both cover a Cleveland Indians game and therefore its interpretation does not give independent meaning to each term. This seeming overlap in the terms of the "operational purposes" exception, however, stems from a non-redundant use of the terms in describing the no-fly-zone rule. Under that rule, it is true, Jacobs Field is a "stadium" covered by the no-fly zone (because it has a seating capacity of more than 30,000), and an Indians game is an "event" covered by the no-fly zone (because it is a Major League Baseball game). But that does not mean "stadium" and "event" do not have independent meaning. In order for the no-fly-zone rule to apply, the "stadium" must have a minimum seating capacity *and* must host a specific type of event—so that certain events (say, an NCAA Division One college football game or a NASCAR race) would not be covered if they took place in a stadium with a seating capacity of less than 30,000 people. *See, e.g.*, http://www.collegegridirons.com/mac/DoytPerryStadium.htm (noting 28,599 seat capacity of Doyt Perry Stadium, which hosts the Division One Bowling Green Falcons). And a stadium with a seating capacity of over 30,000 (take Giants Stadium, capacity 80,242) would not qualify when hosting a game by the New York/New Jersey Metrostars who play professional soccer.

Just as the terms "event" and "stadium" have independent meaning in the description of the no-fly-zone rule, they ought to be treated as having independent meaning in the description of the exception to the rule (permitting waivers "with respect to an event, stadium, or other venue . . . for operational purposes"). Again, while it is true that the "operational purposes" exception for an "event" (an Indians game) will frequently overlap with the exception for a "stadium" (Jacobs Field), that need not always be the case. What the owners of a team may need to do to put on an event does not invariably overlap with what the owners of a stadium may need to do to host an event.

Third, the Air Show argues that the FAA's denial of the waiver "fail[ed] to serve the purpose for which air show [no-fly zones] were created" and is therefore unreasonable. Air Show Br. at 22. The FAA created no-fly zones prior to September 11, 2001, the argument continues, and it originally accommodated aerial demonstrations like the air show. But the short answer to this objection is that, since the FAA's creation of no-fly zones, Congress has spoken and has not provided an exception for air shows.

Fourth, the Air Show points out that in 2003, under essentially the same provisions that existed in 2004, the FAA granted a waiver to the Air Show during an Indians game. But as the FAA has acknowledged, the 2003 waiver decision was a mistake, FAA Br. at 26 ("That was an error on FAA's part which it has not repeated."), and that error does not render its present, correct interpretation unreasonable, *see Peoples Fed. Sav. and Loan Ass'n of Sidney v. Comm'r of Internal Revenue*, 948 F.2d 289, 305 (6th Cir. 1991) ("[T]he Commissioner's new regulation is reasonable. His desire to correct a previous ruling later determined to be wrong is not *unreasonable*, and the freedom of agencies to correct mistakes is a matter of recognized importance in the cases."); *see also United Gas Improvement Co. v. Callery Props., Inc.,* 382 U.S. 223, 229 (1965) ("An agency, like a court, can undo what is wrongfully done by virtue of its order."); *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001) ("As such, the [ ] argument . . . now reduces to the assertion that the agency may not retroactively correct its own legal mistakes, even when those missteps have been highlighted by the federal judiciary. But this is not the law.") A government agency, like a judge, may correct a mistake, and no principle of administrative law consigns the agency to repeating the mistake into perpetuity.

Finally, the Air Show claims that the FAA "issued a discretionary exemption" when it allowed Department of Defense aircraft to fly during the Indians game in 2004 and argues that the

Air Show's other aircraft deserve an exemption as well. Air Show Br. at 26. Not true. The FAA did not grant a "discretionary" exemption to the DOD. That is because, by its terms, Notice 2/0199's "restriction does not apply to Department of Defense . . . flight operations that are in contact with [air traffic control]," a rule that does not apply to other aircraft involved in the air show.

B.

In the event the FAA has reasonably interpreted the statute to prohibit the Air Show from obtaining a waiver, the Air Show contends that the statute violates the Equal Protection Clause's prohibition against irrational legislation—because there is no good reason for allowing Disney events and certain major league sports to receive preferential treatment relative to the Air Show. We disagree.

"[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'n, Inc.*, 508 U.S. 307, 313 (1993). The classification "comes to us bearing a strong presumption of validity," *id*. at 314, and the Air Show must "negative every conceivable basis which might support it," *id*. at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (internal quotation marks omitted)). *See also id*. at 314 ("[J]udicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.") (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

Congress's decision to grant exclusive no-fly zones (and waivers for "operational purposes") to major sporting events and the Disney properties, but not to the Air Show, satisfies these modest requirements. As in many areas of legislation, this is a situation in which "the legislature must necessarily engage in a process of line-drawing"—with some events invariably being included and others being excluded. *Beach Commc'n, Inc.*, 508 U.S. at 315; *see United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("[I]nevitably . . . some persons who have an almost equally strong claim to favored treatment [will] be placed on different sides of the line, and the fact [that] the line might have been drawn differently . . . is a matter for legislative, rather than judicial, consideration."); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 553 (1949) ("It is difficult to say of many lines drawn by legislation that they give those just above and those just below the line a perfectly equal protection.").

While Congress plausibly could have drawn the line here in a variety of ways, the choice it made assuredly was a rational one. Congress legitimately could have determined that certain major sports events and the Disney theme parks were quintessentially American and therefore presented especially attractive targets to terrorists. *Cf. Colo. Cross-Disability Coal. v. Colo. Rockies Baseball Club*, *Ltd.*, 336 F. Supp. 2d 1141, 1147 (D. Colo. 2004) ("According to an old saying, baseball is as American as Mom and apple pie."); *Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athletic Ass'n*, 546 F. Supp. 1276, 1297 (D. Okla. 1982) ("So powerful is the appeal of college football on Saturday afternoons that for the past few seasons, the CBS network 'went dark' on half of the afternoons on which NCAA football was being shown on ABC. That is, CBS offered no programming at all."). And in deciding to exclude air shows, Congress reasonably could have decided that they not only did not have the same iconic status as these other events but that these four-day events also did not present a permanent structural target for terrorists in the same way that these other venues do. Or perhaps Congress simply determined that terrorists were not likely to disturb an event teeming with Department of Defense airplanes or other high-tech airplanes manned by virtuoso pilots. Any one of these conceivable bases would suffice to uphold the statute, establishing that the Air Show has not negated "every conceivable basis which might support" the classification. *Beach Commc'n, Inc.*, 508 U.S. at 315.

No doubt, Congress's decision has placed the Air Show in a difficult situation, but "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 307. "The Constitution presumes that . . . even improvident decisions will eventually be rectified by the democratic process," *Vance*, 440 U.S. at 97, and, to the extent this is such a decision, there is no reason to doubt that the Air Show will not be able to obtain relief through the legislature rather than the courts.

IV.

For these reasons, we deny the petition for review.