Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 6, 2007        Decided February 8, 2008

No. 05-1097

STATE OF NEW JERSEY, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

UTILITY AIR REGULATORY GROUP, ET AL.,
INTERVENORS

———

Consolidated with Nos.
05-1104, 05-1116, 05-1118, 05-1158, 05-1159, 05-1160,
05-1162, 05-1163, 05-1164, 05-1167, 05-1174, 05-1175,
05-1176, 05-1183, 05-1189, 05-1263, 05-1267, 05-1270,
05-1271, 05-1275, 05-1277, 06-1211, 06-1220, 06-1231,
06-1287, 06-1291, 06-1293, 06-1294

———

On Petitions for Review of the Final Action of the
Environmental Protection Agency

———

*James S. Pew* argued the cause for Environmental Petitioners. With him on the briefs were *John D. Walke*, *Jon Devine*, *Scott Edwards*, *Jon A. Mueller*, *Ann Brewster Weeks*, *Jonathan F. Lewis*, *Brad Kuster*.

*Vanya S. Hogen*, *Colette Routel*, *Sarah I. Wheelock*, *Riyaz A. Kanji*, *Philip E. Katzen*, and *Ann Tweedy* were on the briefs for petitioners National Congress of American Indians and Treaty Tribes. *Brian B. O'Neill* entered an appearance.

*Bart E. Cassidy* and *Meredith DuBarry Huston* were on the briefs for petitioner ARIPPA. *Carol F. McCabe* entered an appearance.

*Scott C. Oostdyk*, *Neal J. Cabral*, *Grant F. Crandall*, *Judith Ellen Rivlin*, and *Eugene M. Trisko* were on the briefs for petitioners American Coal for Balanced Mercury Regulation, et al. and United Mine Workers of America, AFL-CIO.

*James B. Vasile*, *Brian R. Gish*, *Susan E. Reeves*, and *Robert K. Reges* were on the briefs for petitioner Alaska Industrial Development and Export Authority.

*Anne Milgram*, Attorney General, Attorney General's Office of the State of New Jersey, *Christopher D. Ball* and *Ruth E. Carter*, Deputy Attorneys General, *Edmund G. Brown, Jr.*, Attorney General, Attorney General's Office of the State of California, *Susan Durbin*, Deputy Attorney General, *Richard Blumenthal*, Attorney General, Attorney General's Office of the State of Connecticut, *Matthew Levine*, Assistant Attorney General, *Joseph R. Biden, III*, Attorney General, Attorney General's Office of the State of Delaware, *Valerie S. Csizmadia*, Deputy Attorney General, *Lisa Madigan*, Attorney General, Attorney General's Office of the State of Illinois, *Ann Alexander*, Assistant Attorney, *G. Steven Rowe*, Attorney

General, Attorney General's Office of the State of Maine, *Gerald D. Reid*, Assistant Attorney General, *Douglas F. Gansler*, Attorney General, Attorney General's Office of the State of Maryland, *Kathy M. Kinsey* and *Judah Prero*, Assistant Attorneys General, *Martha Coakley*, Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, *William L. Pardee*, Assistant Attorney General, *Michael A. Cox*, Attorney General, Attorney General's Office of the State of Michigan, Michigan Department of Environmental Quality, *Thomas L. Casey*, Solicitor General, *Alan F. Hoffman* and *Neil D. Gordon*, Assistant Attorneys General, *Lori Swanson*, Attorney General, Attorney General's Office of the State of Minnesota, *Alan C. Williams*, Assistant Attorney General, *Kelly A. Ayotte*, Attorney General, Attorney General's Office of the State of New Hampshire, *Maureen D. Smith*, Senior Assistant Attorney General, *Gary King*, Attorney General, Attorney General's Office of the State of New Mexico, *Karen L. Reed*, Assistant Attorney General, *Andrew M. Cuomo*, Attorney General, Attorney General's Office of the State of New York, *Jacob Hollinger*, Assistant Attorney General, *Robert A. Reiley*, Assistant Counsel, Commonwealth of Pennsylvania, Department of Environmental Protection, *Patrick C. Lynch*, Attorney General, Attorney General's Office of the State of Rhode Island, *Terence Tierney*, Special Assistant Attorney General, *William H. Sorrell*, Attorney General, Attorney General's Office of the State of Vermont, *Kevin O. Leske*, Assistant Attorney General, *J.B. Van Hollen*, Attorney General, Attorney General's Office of the State of Wisconsin, *Thomas J. Dawson*, Assistant Attorney General, and *William R. Phelan, Jr.*, Attorney, for the City of Baltimore, Maryland, were on the briefs for Government Petitioners. *Jean P. Reilly* and *Kevin P. Auerbacher*, Assistant Attorneys General, Attorney General's Office of the State of New Jersey, *Peter H. Lehner*, Assistant Attorney General, Attorney General's Office of the State of Connecticut, *Christopher D. Coppin*, Assistant Attorney General, Attorney

General's Office of the State of New Mexico, *Gerald T. Karr*, Assistant Attorney General, Attorney General's Office of the State of Illinois, entered appearances.

*Henry V. Nickel*, *F. William Brownell*, *David G. Scott*, and *Lee B. Zeugin* were on the briefs for petitioner Utility Air Regulatory Group.

*Eric G. Hostetler*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *John C. Cruden*, Deputy Assistant Attorney General, *Jon M. Lipshultz* and *Matthew R. Oakes*, Attorneys, and *Carol S. Holmes* and *Howard J. Hoffman*, Counsel, U.S. Environmental Protection Agency. *Wendy L. Blake*, Attorney, U.S. Environmental Protection Agency, entered an appearance.

*Lee B. Zeugin* argued the cause for Industry State Intervenors and State *Amici Curiae*. With him on the briefs were *Troy King*, Attorney General, Attorney General's Office of the State of Alabama, *Milt E. Belcher*, Assistant Attorney General, *Wayne Stenehjem*, Attorney General, Attorney General's Office of the State of North Dakota, *Paul Seby*, Special Assistant, *Lyle Witham*, Solicitor General, *Steve Carter*, Attorney General, Attorney General's Office of the State of Indiana, *Thomas M. Fisher*, Assistant Attorney General, *Lawrence E. Long*, Attorney General, Attorney General's Office of the State of South Dakota, *Roxanne Giedd*, Deputy Attorney General, *Mark J. Rudolph*, Senior Counsel, State of West Virginia, Department of Environmental Protection, *Peter H. Wyckoff*, *Henri D. Bartholomot*, *Jon C. Bruning*, Attorney General, Attorney General's Office of the State of Nebraska, *Jodi Fenner*, Assistant Attorney General, *Patrick Crank*, Attorney General, Attorney General's Office of the State of Wyoming, *Nancy Vehr*, Assistant Attorney General, *Henry V. Nickel*, *F. William Brownell*, *Lee B. Zeugin*, *William M.*

*Bumpers*, *Debra J. Jezouit*, and *Peter Glaser*. *Valerie M. Tachtiris*, Assistant Attorney General, Attorney General's Office of State of Indiana, *Jay A. Jerde* and *Vicci M. Colgan*, Assistant Attorneys General, Attorney General's Office of State of Wyoming, *Kevin C. Newsom*, *Harold P. Quinn, Jr.*, and *Claudia M. O'Brien* entered appearances.

*Leah W. Casey* was on the brief for intervenor for petitioner Adirondack Mountain Club.

*Charles H. Knauss*, *Sandra P. Franco*, and *David G. Scott, II* were on the brief for intervenors Producers for Electric Reliability and West Associates. *Karma B. Brown* entered an appearance.

*John T. Suttles, Jr.* was on the brief for intervenors Physicians for Social Responsibility, et al.

*Peter Glaser, Daniel J. Popeo*, and *Paul D. Kamenar* were on the brief for *amicus curiae* Washington Legal Foundation in support of respondent.

Before: ROGERS, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Before the court are petitions for review of two final rules promulgated by the Environmental Protection Agency regarding the emission of hazardous air pollutants ("HAPs") from electric utility steam generating units ("EGUs"). The first rule removes coal- and oil-fired EGUs from the list of sources whose emissions are regulated under section 112 of the Clean Air Act ("CAA"), 42 U.S.C. § 7412. *Revision of December 2000 Regulatory Finding* ("Delisting Rule"), 70 Fed. Reg. 15,994 (Mar. 29, 2005). The second rule

sets performance standards pursuant to section 111, 42 U.S.C. § 7411, for new coal-fired EGUs and establishes total mercury emissions limits for States and certain tribal areas, along with a voluntary cap-and-trade program for new and existing coal-fired EGUs. *Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units* ("CAMR"), 70 Fed. Reg. 28,606 (May 18, 2005).

Petitioners contend that the Delisting Rule is contrary to the plain text and structure of section 112. In response, EPA and certain intervenors rely on section 112(n), which sets special conditions before EGUs can be regulated under section 112, to justify the rule. We hold that the delisting was unlawful. Section 112 requires EPA to regulate emissions of HAPs. Section 112(n) requires EPA to regulate EGUs under section 112 when it concludes that doing so is "appropriate and necessary." In December 2000, EPA concluded that it was "appropriate and necessary" to regulate mercury emissions from coal- and oil-fired power plants under section 112 and listed these EGUs as sources of HAPs regulated under that section. In 2005, after reconsidering its previous determination, EPA purported to remove these EGUs from the section 112 list. Thereafter it promulgated CAMR under section 111. EPA's removal of these EGUs from the section 112 list violates the CAA because section 112(c)(9) requires EPA to make specific findings before removing a source listed under section 112; EPA concedes it never made such findings. Because coal-fired EGUs are listed sources under section 112, regulation of existing coal-fired EGUs' mercury emissions under section 111 is prohibited, effectively invalidating CAMR's regulatory approach. Accordingly, the court grants the petitions and vacates both rules.

**I.**

In 1970, Congress added section 112 to the CAA. Pub. L. No. 91-604, § 4(a), 84 Stat. 1676, 1685 (1970). In its original form, section 112 required EPA to list HAPs that should be regulated because they could "cause, or contribute to, an increase in mortality or an increase in serious irreversible[] or incapacitating reversible[] illness." *Id*. § 112(a)(1). Over the next eighteen years, however, EPA listed only eight HAPs, established standards for only seven of these and as to these seven addressed only a limited selection of possible pollution sources. *See Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1353 n.1 (D.C. Cir. 1995); S. COMM. ON ENV'T & PUB. WORKS, CLEAN AIR ACT AMENDMENTS OF 1989, S. REP. NO. 101-228, at 131 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3516.

In 1990, Congress, concerned about the slow pace of EPA's regulation of HAPs, altered section 112 by eliminating much of EPA's discretion in the process. *See, e.g.*, *Nat'l Lime Ass'n.* v. *EPA*, 233 F.3d 625, 633-34 (D.C. Cir. 2000). Three aspects of the amendments are relevant here.

First, Congress required EPA to regulate more than one hundred specific HAPs, including mercury and nickel compounds. CAA § 112(b)(1). Further, EPA was required to list and to regulate, on a prioritized schedule, *id*. § 112(e)(1)-(3), "all categories and subcategories of major sources and areas sources" that emit one or more HAPs, *id*. § 112(c)(1). In seeking to ensure that regulation of HAPs reflects the "maximum reduction in emissions which can be achieved by application of [the] best available control technology," S. REP. NO. 101-228, at 133, *reprinted in* 1990 U.S.C.C.A.N. at 3518; *see, e.g*., CAA § 112(g)(2)(A), Congress imposed specific, strict pollution control requirements on both new and existing sources of HAPs. Congress specified that new sources must

adopt at minimum "the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator." *Id*. § 112(d)(3). Existing sources (with certain exceptions) must adopt emission controls equal to the "average emission limitation achieved by the best performing 12 percent of the existing sources." *Id*. § 112(d)(3)(A).

Second, Congress restricted the opportunities for EPA and others to intervene in the regulation of HAP sources. For HAPs that result in health effects other than cancer, as is true of mercury, Congress directed that the Administrator "may delete any source category" from the section 112(c)(1) list only after determining that "emissions from no source in the category or subcategory concerned . . . exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source." *Id*. § 112(c)(9). Third parties may not challenge the Administrator's decision to add a pollutant to the list under section 112(b) or a source category or subcategory to the list under section 112(c) until "the Administrator issues emission standards for such pollutant or category." *Id*. § 112(e)(4).

Third, Congress required the Administrator to evaluate regulatory options with care and to meet certain conditions before listing EGUs as an HAP source under section 112(c)(1). Specifically:

> [t]he Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by [EGUs] of pollutants listed under subsection (b) of this section after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the

Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. *The Administrator shall regulate [EGUs] under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.*

*Id*. § 112(n)(1)(A) (emphasis added).

The study of public health hazards required by section 112(n)(1)(A) was finally completed in 1998. This study found "a plausible link between anthropogenic releases of mercury from industrial and combustion sources in the United States and methylmercury in fish" and that "mercury emissions from [EGUs] may add to the existing environmental burden." EPA, OFFICE OF AIR QUALITY PLANNING AND STANDARDS, STUDY OF HAZARDOUS AIR POLLUTANT EMISSIONS FROM ELEC. UTIL. STEAM GENERATING UNITS--FINAL REPORT TO CONG. 7-1, 45 (1998). On December 20, 2000, the Administrator announced — in light of the study mandated by section 112(n)(1)(A), as well as subsequent information and consideration of alternative feasible control strategies — that it was "appropriate and necessary" to regulate coal- and oil-fired EGUs under section 112 because, as relevant, mercury emissions from EGUs, which are the largest domestic source of mercury emissions, present significant hazards to public health and the environment. *Regulatory Finding on the Emissions of Hazardous Air Pollutants From Electric Utility Steam Generating Units*, 65 Fed. Reg. 79,825, 79,827 (Dec. 20, 2000) ("2000 Determination"). "As a result the source category for Coal- and Oil-Fired [EGUs] was added to the list of source categories under section 112(c)" on December 20, 2000. *National Emission Standards for Hazardous Air Pollutants: Revision of Source Category List Under Section 112 of the Clean Air Act*

("2002 Notice of Listing"), 67 Fed. Reg. 6521, 6522, 6524 (Feb. 12, 2002).

In early 2004, EPA proposed two regulatory alternatives to control emissions from coal- and oil-fired EGUs. The first was similar to EPA's proposal in 2000 — regulation under section 112 through issuance of Maximum Achievable Control Technology standards, *see, e.g.*, CAA § 112(g)(2)(A), or implementation of a cap-and-trade system. The second proposed removing EGUs from the list of HAP sources prepared pursuant to section 112(c)(1) and instead regulating their emissions under section 111.[1] *Proposed National Emission Standards for Hazardous Air Pollutants; and, in the Alternative, Proposed Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units*, 69 Fed. Reg. 4652, 4659-61, 4683, 4689 (Jan. 30, 2004). After receiving public comment, EPA chose the second alternative, announcing in March 2005 that it was removing EGUs from the section 112(c)(1) list, Delisting Rule, 70 Fed. Reg. at 16,002-08, 16,032, and regulating mercury emissions from coal-fired EGUs under section 111, CAMR, 70 Fed. Reg. at 28,610, 28,624-32.

---

[1] Section 111 requires the Administrator to "establish[] . . . standards of performance," CAA § 111(b)(1)(B), for pollutants from new sources that in the Administrator's judgment "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id*. § 111(b)(1)(A). "Standards of performance" are designed to limit emissions to reflect "the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." *Id*. § 111(a)(1). Existing sources of pollutants are regulated under section 111(d).

EPA justified its decision to delist EGUs by explaining that it "reasonably interprets section 112(n)(1)(A) as providing [] authority to remove coal- and oil-fired units from the section 112(c) list at any time that it makes a negative appropriate and necessary finding under the section." Delisting Rule, 70 Fed. Reg. at 16,032. It based this interpretation on the "entirely different structure and predicate for assessing whether [EGUs] should be listed for regulation under section 112" as set forth in section 112(n)(1)(A), *id.*, and on the absence of a temporal "deadline" for deciding "whether regulation of [EGUs was] appropriate and necessary" under section 112, *id*. at 16,001. It also interpreted "section 112(c)(9) [delisting] criteria . . . not [to] apply" to EGUs because their inclusion in the list established by section 112(c)(1) was not a "final agency action[]," and claimed, contrary to the 2000 Determination, that "the source category at issue did not meet the statutory criteria for listing at the time of listing." *Id*. at 16,033.

Having decided that it possessed the authority to delist EGUs without making the findings required by section 112(c)(9), EPA explained that the delisting of EGUs was justified because their regulation under section 112 was neither "appropriate" nor "necessary." The potential mercury emissions reductions achievable under CAMR figured prominently in EPA's explanation of its delisting of coal-fired EGUs, *id.* at 16,005, which EPA promulgated in May 2005. CAMR established plant-specific "standards of performance" for mercury emissions from new coal-fired EGUs under section 111(b). 70 Fed. Reg. at 28,613-16. Relying on sections 111(b) and (d), it also established a national mercury emissions cap for new and existing EGUs, allocating each state and certain tribal areas a mercury emissions budget. This was supplemented by a voluntary cap-and-trade program. *Id*. at 28,616, 28,622,

28,629.[2]

## II.

New Jersey and fourteen additional States, the Michigan Department of Environmental Quality, the Pennsylvania Department of Environmental Protection, the City of Baltimore ("Government Petitioners"), and various environmental organizations ("Environmental Petitioners") contend that EPA violated Section 112's plain text and structure when it did not comply with the requirements of section 112(c)(9) in delisting EGUs. Because we agree, we do not reach their alternative contention that even if this delisting was lawful, EPA was arbitrary and capricious in reversing its determination that regulating EGUs under section 112 was "appropriate and necessary." Government and Environmental Petitioners further contend that CAMR is inconsistent with provisions of section 111, and that both the Delisting Rule and CAMR should be vacated. Certain intervenors — including various industry representatives, States, and state agencies — join EPA in urging the lawfulness of the two rules.

The court reviews the challenges to the final rules to determine whether EPA's promulgation of them was arbitrary or capricious, an abuse of discretion, or otherwise not in

---

[2] Upon reconsideration, EPA made no substantive change to the Delisting Rule but revised CAMR's State mercury allocations and the statistical analysis used for new source performance standards; EPA declined to stay CAMR. *Revision of December 2000 Clean Air Act Section 112(n) Finding Regarding Electric Utility Steam Generating Units; and Standards of Performance for New and Existing Electric Utility Steam Generating Units: Reconsideration*, 71 Fed. Reg. 33,388, 33,388-89, 33,395-96 (June 9, 2006).

accordance with law. *See* CAA § 307(d)(9)(A), 42 U.S.C. § 7607(d)(9)(A). Challenges to EPA's interpretation of the CAA itself are governed by the familiar two-pronged test of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under step one, the court asks "whether Congress has directly spoken to the . . . issue." *Id*. at 842. If Congress's intent "is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. However, if the court determines that "Congress has not directly addressed the precise question at issue," then, under step two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. The agency's interpretation need not be the only permissible reading of the statute, nor the interpretation that the court might have originally given the statute. *Id*. at 843 n.11.

Petitioners contend that once the Administrator determined in 2000 that EGUs should be regulated under Section 112 and listed them under section 112(c)(1), EPA had no authority to delist them without taking the steps required under section 112(c)(9). We agree.[3]

Section 112(c)(9) provides that:

---

[3] Certain intervenors also contend, citing *Thomas v. New York*, 802 F.2d 1443, 1446-47 (D.C. Cir. 1986), that the Administrator's determination in December 2000 to list EGUs as a source under section 112(c)(1) was not binding for lack of notice and comment and, consequently, that EPA was never required to comply with section 112(c)(9)'s delisting process for EGUs. We need not consider this contention, however, because EPA has steadfastly refused to join it. *See New York v. Reilly*, 969 F.2d 1147, 1154 n.11 (D.C. Cir. 1992); *see also Util. Air Regulatory Group v. EPA*, No. 01-1074, 2001 WL 936363, at *1 (D.C. Cir. July 26, 2001).

> The Administrator may delete *any* source category from the [section 112(c)(1) list] . . . whenever the Administrator . . . [determines] that emissions from no source in the category or subcategory concerned . . . exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source. [emphasis added]

EPA concedes that it listed EGUs under section 112. Thus, because section 112(c)(9) governs the removal of "*any* source category" (emphasis added) from the section 112(c)(1) list, and nothing in the CAA exempts EGUs from section 112(c)(9), the only way EPA could remove EGUs from the section 112(c)(1) list was by satisfying section 112(c)(9)'s requirements. Yet EPA concedes that it never made the findings section 112(c)(9) would require in order to delist EGUs. EPA's purported removal of EGUs from the section 112(c)(1) list therefore violated the CAA's plain text and must be rejected under step one of *Chevron*.

EPA offers several arguments in an attempt to evade section 112(c)(9)'s plain text, but they are not persuasive. First, EPA seeks to reach step two of *Chevron* and obtain judicial deference to its interpretation by maintaining that section 112(n)(1) makes section 112(c)(9) ambiguous because "[l]ogically, if EPA makes a determination under section 112(n)(1)(A) that power plants should not be regulated at all under section 112 . . . [then] this determination *ipso facto* must result in removal of power plants from the section 112(c) list." Resp't Br. at 26. But this simply does not follow. Section 112(n)(1) governs how the Administrator decides whether to list EGUs; it says nothing about delisting EGUs, and the plain text of section 112(c)(9) specifies that it applies to the delisting of "any source." In the context of the CAA, "the word 'any' has an expansive

meaning." *New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006) (citations omitted); *see also id.* at 885-86. Moreover, where Congress wished to exempt EGUs from specific requirements of section 112, it said so explicitly. For example, section 112(c)(6) expressly exempts EGUs from the strict deadlines imposed on other sources of certain pollutants. Furthermore, EPA concedes that listing EGUs under section 112(c) triggered application of some subparts of section 112, *see, e.g.*, 2002 Notice of Listing, 67 Fed. Reg. at 6521, 6524, 6535 n.b; CAA § 112(c)(2), but provides no persuasive rationale for why the comprehensive delisting process of section 112(c)(9) does not also apply. Its brief states only that previous applications of section 112 provisions in response to EGUs' listing were undertaken "based on the fact that [EPA] had made a positive 'appropriate and necessary' finding that was still in place. EPA has now reversed that finding." Resp't Br. at 28. This explanation deploys the logic of the Queen of Hearts, substituting EPA's desires for the plain text of section 112(c)(9). Thus, EPA can point to no persuasive evidence suggesting that section 112(c)(9)'s plain text is ambiguous. It is therefore bound by section 112(c)(9) because "for [] EPA to avoid a literal interpretation at *Chevron* step one, it must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it," *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996), showings EPA has failed to make.

Second, EPA maintains that it possesses authority to remove EGUs from the section 112 list under the "fundamental principle of administrative law that an agency has inherent authority to reverse an earlier administrative determination or ruling where an agency has a principled basis for doing so." Resp't Br. at 22 (citing *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006); *Dun & Bradstreet*

*Corp. Found. v. USPS*, 946 F.2d 189, 193 (2d Cir. 1991)). An agency can normally change its position and reverse a decision, and prior to EPA's listing of EGUs under section 112(c)(1), nothing in the CAA would have prevented it from reversing its determination about whether it was "appropriate and necessary" to do so. Congress, however, undoubtedly can limit an agency's discretion to reverse itself, and in section 112(c)(9) Congress did just that, unambiguously limiting EPA's discretion to remove sources, including EGUs, from the section 112(c)(1) list once they have been added to it. This precludes EPA's inherent authority claim for "EPA may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001). As this court has observed, "when Congress has provided a mechanism capable of rectifying mistaken actions . . . it is not reasonable to infer authority to reconsider agency action." *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984). Indeed, EPA's position would nullify section 112(c)(9) altogether, not just with regard to EGUs, for EPA is unable to explain how, if it were allowed to remove EGUs from the section 112 list without regard to section 112(c)(9), it would not also have the authority to remove any other source by ignoring the statutory delisting process.

Finally, EPA states in its brief that it has previously removed sources listed under section 112(c) without satisfying the requirements of section 112(c)(9). But previous statutory violations cannot excuse the one now before the court. "[W]e do not see how merely applying an unreasonable statutory interpretation for several years can transform it into a reasonable interpretation." *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 598 (D.C. Cir. 1996). EPA suggests that it would be "anomalous" for it to be forced to await a court order to correct "its own mistake" in listing coal- and oil-fired EGUs as a source under section 112(c)(1). Resp't Br. at 32; *see also id.* at 33 (citing

*Cleveland Nat'l Air Show, Inc. v. DOT*, 430 F.3d 757, 765 (6th Cir. 2005)).  However Congress was not preoccupied with what EPA considers "anomalous," but rather with the fact that EPA had failed for decades to regulate HAPs sufficiently.  *See, e.g.*, *Nat'l Lime Ass'n*, 233 F.3d at 634 (citing S. REP. NO. 101-228, at 128, *reprinted in* 1990 U.S.C.C.A.N. at 3513).  In the context of this congressional concern, EPA's disbelief that it would be prevented from correcting its own listing "errors" except through section 112(c)(9)'s delisting process or court-sanctioned vacatur cannot  overcome the plain text enacted by Congress.

Accordingly, in view of the plain text and structure of section 112, we grant the petitions and vacate the Delisting Rule. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  This requires vacation of CAMR's regulations for both new and existing EGUs.  EPA promulgated the CAMR regulations for existing EGUs under section 111(d), but under EPA's own interpretation of the section, it cannot be used to regulate sources listed under section 112; EPA thus concedes that if EGUs remain listed under section 112, as we hold, then the CAMR regulations for existing sources must fall.  Resp't Br. at 99, 101-02; *see also* Delisting Rule, 70 Fed. Reg. at 16,031.  EPA promulgated  the CAMR regulations for new sources under section 111(b) on the basis that there would be no section 112 regulation of EGU emissions and that the new source performance standards would be accompanied by a national emissions cap and a voluntary cap-and-trade program.  *See* CAMR, 70 Fed. Reg. at 28,608-10, 28,614-15, 28,619, 28,622; *see also id.* at 28,616.  Given that these vital assumptions were incorrect, the court must vacate CAMR's new source performance standards and remand them to EPA for reconsideration, for "[s]everance and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own."  *Davis County Solid Waste Mgmt.*

*v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (citations omitted).  In view of our disposition, the court does not reach other contentions of petitioners or intervenors.