986 A.2d 48

PPL GENERATION, LLC, PPL Montour, LLC and PPL Brunner Island, LLC, Appellees

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF EN- VIRONMENTAL PROTECTION and Commonwealth of Penn- sylvania, Environmental Quality Board, Appellants.

Supreme Court of Pennsylvania.

Submitted June 11, 2009.

Decided Dec. 23, 2009.

Susan P. Shinkman, Pittsburgh, Richard P. Mather, Sr., PA Department of Environmental Protection, Robert Anthony Reiley, for DEP & Env. Quality Board.

Charles McPhedran, Philadelphia, Brian Geoffrey Glass, Citizens for Pennsylvania's Future, for Amicus Curiae PA State Nurses Association.

Barbara A. Zemlock, Terry Robert Bossert, Post & Schell, P.C., Harrisburg, for PPL Generation, PPL Montour, and PPL Brunner Island.

Lawrence A. Demase, Reed Smith, L.L.P., Pittsburgh, for Amicus Curiae Sunbury Generation, LP and Allegheny Energy Supply Company, LLC.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Chief Justice CASTILLE.

This matter is before us on direct appeal from the order of the Commonwealth Court declaring 25 Pa.Code §§ 123.201–123.215 (the "PA Mercury Rule") invalid. For the reasons that follow, we affirm.

PPL Generation, LLC, PPL Montour, LLC and PPL Brunner Island, LLC ("appellees") are owner-operators of coal-fired electric generating units ("EGUs") located in the Commonwealth. On September 15, 2008, appellees filed a Petition for Review in the Commonwealth Court's original jurisdiction, seeking declaratory and injunctive relief. Appellees named the Department of Environmental Protection ("Department")

and the Environmental Quality Board ("Board") as respondents (collectively, "the Commonwealth").

Appellees challenge the validity of certain regulations limiting and controlling mercury emissions emanating from coal-fired EGUs. *See* 25 Pa.Code §§ 123.201–123.215.[1] The PA

1.  The PA Mercury Rule operates as follows. Section 123.205 sets forth the emission standards for coal-fired EGUs. That section states, in pertinent part:

    (c) Existing EGUs. In addition to the mercury emission limitation requirements of § 123.207, the owner or operator of an existing EGU subject to the emission standards for EGUs specified in this section shall comply on a rolling 12–month basis with one of the following standards:

    (1) Phase 1. Effective from January 1, 2010, through December 31, 2014:

    (i) PCF [i.e., a pulverized coal-fired] EGU. The owner or operator of a PCF shall comply with one of the following:

    (A) A mercury emission standard of 0.024 pound of mercury per GWh.

    (B) A minimum 80% control of total mercury as measured from the mercury content in the coal, either as fired or as approved in writing by the Department.

    (ii) CFB [i.e., a circulating fluidized bed] EGU. The owner or operator of a CFB burning coal refuse shall comply with one of the following:

    (A) A mercury emission standard of 0.0096 pound of mercury per GWh.

    (B) A minimum 95% control of total mercury as measured from the mercury content in the coal refuse, either as fired or as approved in writing by the Department.

    (2) Phase 2. Effective beginning January 1, 2015, and each subsequent year:

    (i) PCF EGU. The owner or operator of a PCF shall comply with one of the following:

    (A) A mercury emission standard of 0.012 pound of mercury per GWh.

    (B) A minimum 90% control of total mercury as measured from the mercury content in the coal, either as fired or as approved in writing by the Department.

    25 Pa.Code § 123.205.

    Section 123.207, in turn, provides that:

    (a) Statewide mercury nontradable allowance program. In addition to the mercury emission standard requirements of § 123.205 (relating to emission standards for coal-fired EGUs), the owner or operator of a new or existing affected EGU subject to § 123.203 (relating to applicability) shall comply with the annual emission limitations established through a Statewide mercury nontradable allowance program under this section. The Department will issue to the owner or operator of an affected EGU a plan approval or operating permit

Mercury Rule's limits on mercury emissions will become effective January 1, 2010.

The genesis of the PA Mercury Rule was a petition for rulemaking filed on August 9, 2004 by several political action groups. This petition for rulemaking requested that regulations to reduce mercury emissions from coal-fired EGUs be adopted. At the time the petition for rulemaking was presented, oil- and coal-fired EGUs were listed as a mercury pollution source under Section 112 of the federal Clean Air Act. 42 U.S.C. § 7412. Per the Pennsylvania Air Pollution Control Act ("PA Air Pollution Act"), 35 P.S. §§ 4001–4015, the Board may promulgate regulations regarding mercury pollution sources that are not included on the federal Section 112 list. 35 P.S. § 4006.6(a).[2] The Board generally, however, cannot

> (including Title V) that contains the applicable requirements of this section and §§ 123.202–123.206 and 123.208–123.215 before the later of January 1, 2010, or the date on which the affected EGU commences operation.
> (b) Emission limitation set-asides. The total ounces of mercury emissions available for emission limitation set-asides as annual nontradable mercury allowances in the Statewide mercury allowance program are:
>> (1) 56,928 ounces (3,558 pounds) of mercury emissions for Phase 1, effective from January 1, 2010, through December 31, 2014.
>> (2) 22,464 ounces (1,404 pounds) of mercury emissions for Phase 2, effective beginning January 1, 2015, and each subsequent year.
> 25 Pa.Code § 123.207.

**2.** *Section 4006.6(a) states:*
> The regulations establishing performance or emission standards promulgated under section 112 of the Clean Air Act are incorporated by reference into the department's permitting program. After the effective date of the performance or emission standard, new, reconstructed, modified and existing sources shall comply with the performance or emission standards pursuant to the compliance schedule established under section 112 of the Clean Air Act and the regulations promulgated under the Clean Air Act. The Environmental Quality Board may not establish a more stringent performance or emission standard for hazardous air pollutant emissions from existing sources, except as provided in subsection (d). This section shall not apply to rules and regulations adopted as final prior to the effective date of this act and shall not be construed to weaken standards for individual sources or facilities in effect prior to the effective date of this act. The board may establish performance or emission standards for sources or categories of sources which are not included on the list of source categories established under section 112(c) of the Clean Air

establish independent emission and performance standards for pollutants listed under Section 112.[3] Thus, at the time the petition for rulemaking was filed, the Board's rulemaking options regarding mercury emitted by oil- and coal-fired EGUs were limited by the federal regulations. *See* 35 P.S. § 4006.6(a).

Shortly after the petition for rulemaking was presented, however, the U.S. Environmental Protection Agency ("EPA") promulgated a final rule, commonly referred to as the "Delisting Rule." That rule removed oil- and coal-fired EGUs from Section 112's list of mercury pollution sources. 70 Fed.Reg. 15994–01 (03/29/2005). However, the EPA did not abolish regulation of mercury emissions from oil- and coal-fired EGUs. Rather, it shifted the responsibility for the mechanics of the regulation to the states. To accomplish this shifting to the states, the EPA promulgated the Clean Air Mercury Rule ("CAMR"). 70 Fed.Reg. 28606 (5/18/2005). CAMR was predicated on the Delisting Rule and it established a mercury emission budget for each state and required each state to develop a program to regulate the mercury emissions emanating from oil- and coal-fired EGUs. For Pennsylvania, the EPA allocated a mercury emission budget of 1.78 tons per year for the years 2010 to 2017. Starting in 2018, Pennsylvania's mercury emission budget would fall to 0.702 tons per year.

Act. For purposes of this section, the term "performance standard" includes design, equipment, work practice or operational standards or any combination thereof.
35 P.S. § 4006.6(a).

3. Section 4006.6(d) contains an exception to this general rule, allowing for regulation of Section 112–listed sources whenever it is necessary to "protect public health, welfare and the environment from emissions of hazardous air pollutants...." 35 P.S. § 4006.6(d). There are particular, strict standards for properly promulgating regulations per Section 4006.6(d). Specifically, Section 4006.6(d) provides that the new Commonwealth regulations must follow the standards that the federal Clean Air Act provides for adopting pollution-control regulations.

Critically, the Board did not invoke Section 4006.6(d) in promulgating the PA Mercury Rule. Rather, the Commonwealth's position is that the PA Mercury Rule is authorized per Section 4006.6(a) as mercury emissions emanating from coal- and oil-fired EGUs were later delisted from Section 112. Commonwealth's Brief at 31 n. 7.

CAMR gave the states two options to adopt in order to be in compliance with their mercury emission budgets. One option was to participate in a cap-and-trade system, which allowed for the states participating in that system to trade mercury emission allowances with other states. The other option was to forego participating in the cap-and-trade program, and instead to establish a state program to control mercury emissions so that the emissions did not exceed the cap set for that state by CAMR.

The Commonwealth elected not to participate in the cap-and-trade program, and opted to develop a mercury regulation program that would keep emissions within the mercury budget set by the EPA. The PA Mercury Rule was developed as our Commonwealth's response to CAMR. Pertinent to this appeal, the PA Mercury Rule required, *inter alia,* that by January 1, 2010, appellees reduce mercury emissions at their coal-fired EGUs by 80%.

The Delisting Rule and CAMR sparked federal litigation. Various environmental groups and several state governmental entities, including our Commonwealth's Department, filed petitions for review in the United States Court of Appeals for the District of Columbia ("DC Circuit Court"), challenging the Delisting Rule and CAMR. *See New Jersey v. Environmental Protection Agency,* 517 F.3d 574 (D.C.Cir.2008).[4] The petitions for review asserted that the Delisting Rule did not follow the procedures set forth in Section 112(c)(9) of the Clean Air

---

4.  The Department joined in this federal action, at least in part, because it believed CAMR's optional cap-and-trade program allowed sister states to emit an excessive amount of mercury into the air. Appellees also participated, although they argued in favor of finding the Delisting Rule and CAMR valid.

   In their filings to this Court, both the Commonwealth and appellees emphasize that the opposing parties are now taking positions that are in marked opposition to the positions taken in the *New Jersey* litigation. Both sides imply that we should reject the opposition's arguments because, in essence, they have reversed course.

   The parties' implication that the determination in this case should be predicated on the positions the parties took in the *New Jersey* litigation is without merit. Absent an enforceable estoppel argument, the prior litigation stances are of no moment here.

Act for removing a pollution source from Section 112, *i.e.*, oil- and coal-fired EGUs.

The DC Circuit Court agreed, finding that the plain language of Section 112 required that the EPA satisfy Section 112(c)(9)'s requirements prior to removing a pollution source from Section 112. The court further observed that the EPA conceded that it had never made the findings that Section 112(c)(9) would require in order to delist oil- and coal-fired EGUs. Thus, the court determined that the Delisting Rule was unlawful and vacated it, the effect of which was that EGUs remain listed under Section 112. Significantly, the court also found that once the Delisting Rule was declared invalid, CAMR no longer had a legal basis and it vacated CAMR as well.

After the DC Circuit Court issued its decision in *New Jersey*, appellees commenced the instant litigation. Appellees argued that since the Delisting Rule and CAMR had been declared invalid by the DC Circuit Court, the PA Mercury Rule must fail for the reason that it was predicated on those now-invalid federal regulations. The Commonwealth filed preliminary objections. Appellees filed a motion for summary relief; the Commonwealth responded with a cross-motion for summary relief.

On January 30, 2009, the Commonwealth Court, via a memorandum, single-judge decision authored by the Honorable Dan Pellegrini, denied the Commonwealth's cross-application for summary relief and its preliminary objections, and granted appellees' motion for summary relief. At the outset of his analysis, Judge Pellegrini rejected the Commonwealth's argument that appellees' claim was not yet ripe as the PA Mercury Rule were not effective until January 1, 2010. Judge Pellegrini observed that this Court has expressly authorized pre-enforcement challenges to the validity of regulations. Slip op. at 6 (citing *Arsenal Coal Company v. Department of Environmental Resources*, 505 Pa. 198, 477 A.2d 1333 (1984)).

Judge Pellegrini then turned to the substantive arguments. In a methodical step-by-step analysis, he concluded that the

PA Mercury Rule violates 35 P.S. § 4006.6(a) of the PA Air Pollution Act. He noted that "[t]here is no question that pursuant to the plain language of [4006.6(a)], the Board may only regulate EGUs if they are not listed as a source or category under Section 112 of the [Clean Air Act]." Slip op. at 11–12. Judge Pellegrini reasoned that given the DC Circuit Court's decision in *New Jersey*, the Delisting Rule and CAMR are invalid and EGUs remained listed under Section 112. Therefore, the Board did not have the authority to promulgate the PA Mercury Rule. Judge Pellegrini emphasized that his conclusion was not altered by the fact that the PA Mercury Rule was promulgated during that interim period between promulgation of the Delisting Rule and CAMR and the DC Circuit Court's invalidation of those rules. He reasoned that because the DC Circuit Court had found that the Delisting Rule and CAMR were void *ab initio*, the EGUs must be deemed to have been always listed. Judge Pellegrini declared the PA Mercury Rule invalid and he enjoined the Commonwealth from continued implementation or enforcement of the PA Mercury Rule. However, Judge Pellegrini announced that he:

> [D]ecline[d] to enjoin the Board from promulgating any regulation controlling the emission of hazardous air pollutants from EGUs while EGUs remain listed sources under Section 112 of the Clean Air Act. As conceded by [Appellees] at oral argument, the General Assembly could enact legislation regulating mercury emission which may require the Board to adopt implementing regulations.

Slip op. at 13.

Within a week of Judge Pellegrini's decision, significant developments occurred with respect to the DC Circuit's *New Jersey* decision. On February 6, 2009, the Acting U.S. Solicitor General filed a motion on behalf of the EPA to dismiss a *certiorari* petition pending before the U.S. Supreme Court. That motion to dismiss stated that after the *certiorari* petition was filed, the EPA decided to act in conformity with the DC Circuit Court's decision in *New Jersey* and to develop standards regulating power plant mercury emissions under Sec-

tion 112 of the Clean Air Act. The United States Supreme Court subsequently dismissed the *certiorari* petition filed by the EPA and denied *certiorari* with respect to a companion petition. *See Environmental Protection Agency v. New Jersey,* —— U.S. ——, 129 S.Ct. 1313, 173 L.Ed.2d 575 (*certiorari* dismissed, Feb. 23, 2009) and *Utility Air Regulatory Group v. New Jersey,* —— U.S. ——, 129 S.Ct. 1308, 173 L.Ed.2d 583 (*certiorari* denied, Feb. 23, 2009).

■ In the meantime, the Commonwealth filed a notice of appeal from Judge Pellegrini's decision and this Court noted probable jurisdiction on February 25, 2009. Shortly after the Commonwealth filed its notice of appeal, appellees filed an application to vacate or modify the resulting automatic supersedeas [5] with the Commonwealth Court. The Commonwealth, in turn, filed an application for relief, requesting a hearing and expedited discovery limited to appellees' allegations of irreparable harm. On March 2, 2009, the Commonwealth Court vacated the automatic supersedeas and denied the Commonwealth's application for relief. This Court denied the Commonwealth's ensuing Application to Reinstate Automatic Supersedeas on June 17, 2009. The Commonwealth and appellees then filed their briefs and we have elected to decide the case upon the written submissions given the apparent time constraints.[6]

■ The Commonwealth raises several threshold arguments. First, it asserts that appellees could have challenged the PA Mercury Rule immediately upon promulgation, and since they did not, the Commonwealth submits that appellees have waived any challenge to the Rule.

The Commonwealth's waiver argument is unpersuasive. Appellees' petition for review was predicated on the *New Jersey* court's determination that the Delisting Rule and CAMR were invalid. Temporally, that issue could not have

5. The Commonwealth's notice of appeal operated as an automatic supersedeas. *See* Pa.R.A.P. 1736.

6. As the Commonwealth raises questions of law, our scope of review is plenary and our standard of review is *de novo. Commonwealth v. Santiago,* 978 A.2d 349, 352 n. 4 (Pa.2009).

been raised at the time the PA Mercury Rule was finalized since the *New Jersey* decision postdated it.

The Commonwealth also believes that several general principles of administrative law entitle it to relief. It observes that per 45 Pa.C.S. § 905,[7] it is entitled to a rebuttable presumption upon publication of the regulation that proper adoption procedures were followed. It also argues that environmental regulations which are promulgated pursuant to a grant of legislative power enjoy a presumption of reasonableness, and any person asserting that a regulation is an unreasonable exercise of police power must meet a heavy burden of proof. Commonwealth's Brief at 29–30 (citing *Com., Dept. of Environmental Resources v. Locust Point Quarries, Inc.*, 483 Pa. 350, 396 A.2d 1205 (1979)). The Commonwealth finds it significant that appellees have not asserted that the PA Mercury Rule is unreasonable.

The Commonwealth emphasizes that the PA Mercury Rule in fact is reasonable because it requires EGUs to reduce emissions of mercury, a known hazardous air pollutant. The Commonwealth argues that it was vital that the Board promulgate the PA Mercury Rule because the EPA's approach to reduce mercury emissions, via CAMR, was deficient. The Commonwealth observes that Pennsylvania is one of the highest producers of mercury emissions, and that coal-fired EGUs in the Commonwealth account for the vast majority of the mercury emissions. Thus, the PA Mercury Rule's eventual reduction of mercury emissions is critical to our Commonwealth; without it, there will be significant negative repercussions.

Appellees dispute the Commonwealth's argument that invalidation of the PA Mercury Rule will lead to a major health and environmental crisis. Appellees point out that Section 4006.6(b) of the PA Air Pollution Act provides that the De-

---

**7.** Section 905 states, in pertinent part, that:

The publication in the code, the permanent supplements thereto, or the bulletin of any document shall create a rebuttable presumption:
(1) That it was duly issued, prescribed or promulgated.
45 Pa.C.S. § 905.

partment may establish emission limits on a case-by-case basis and include those limits in the individual permits issued to sources of pollution. Appellees' Brief at 23–24 (citing 35 P.S. § 4006.6(b)).[8] Thus, according to appellees, the Commonwealth has options for reducing mercury emissions, if it deems reduction necessary. Also, both appellees in their earlier filing regarding the Application for Reinstatement of Automatic Supersedeas, and Allegheny Energy Supply Company, LLC and Sunbury Generation, LP in an *amicus curiae* brief, observe that significant mercury emissions reductions are already being effectuated through EGUs' compliance with the federal Clean Air Interstate Rule ("CAIR"), 70 Fed.Reg. 72268 (11/22/2005).[9] CAIR was promulgated to reduce sulfur dioxide and nitrogen oxide emissions, but its implementation will also capture approximately 90% of the mercury emissions generated by the coal-fired EGUs which burn bituminous coal. This co-benefit is particularly strong in Pennsylvania, where approximately 85% of the coal-fired EGUs burn bituminous coal.

■ The Commonwealth's procedural regularity and reasonableness arguments miss the mark. The Commonwealth Court did not hold that the PA Mercury Rule was invalid

8. Section 4006.6(b) states, in pertinent part, that

In the event the [EPA administrator] has not promulgated a standard to control the emissions of hazardous air pollutants for a category or subcategory of major sources under section 112 of the Clean Air Act, pursuant to a schedule established pursuant to section 112(c) of the Clean Air Act, the department shall have the authority to establish a performance or emission standard on a case-by-case basis for individual sources or a category of sources. . . . The performance or emission standard established on a case-by-case basis by the department shall be equivalent to the limitation that would apply to the source if a performance or emission standard had been promulgated by the [EPA administrator] under section 112 of the Clean Air Act.

35 P.S. § 4006.6(b).

9. CAIR has also been the subject of federal litigation. *See North Carolina v. Environmental Protection Agency*, 550 F.3d 1176 (D.C.Cir. 2008); *North Carolina v. Environmental Protection Agency*, 531 F.3d 896 (D.C.Cir.2008). CAIR, however, has not been vacated. Considering the complexities of the federal and state regulations that are implicated, we do not engage in an exhaustive review of the unrelated CAIR regulation in the instant opinion.

because it was unreasonable or because that the Board did not follow proper procedures in promulgating it. Rather, the court found that the PA Mercury Rule was invalid because it was premised on the void federal Delisting Rule. Our focus is properly placed on whether that determination was correct.

In another preliminary argument, the Commonwealth asserts that the Board had the authority to promulgate the PA Mercury Rule pursuant to its general authority to adopt rules and regulations for the prevention, control, reduction and abatement of air pollution. The Commonwealth relies on Section 4005(a) of the PA Air Pollution Act, 35 P.S. § 4005(a)(1). This argument must also fail, as it ignores that this general grant of regulatory authority is subject, *inter alia*, to the specific limitation found at Section 4006.6(a) of the Act.

The Commonwealth next presents a series of interrelated arguments in support of its assertion that the PA Mercury Rule is in accord with the authority delegated by Section 4006.6(a). The Commonwealth takes a snapshot-in-time approach. The Commonwealth observes that Section 4006.6(a) grants the Board rulemaking authority to promulgate performance or emission standards for a source, or categories of sources, not listed in Section 112 of the federal Clean Air Act. The Commonwealth then emphasizes that at the moment in time when the Board promulgated the PA Mercury Rule, the Delisting Rule had yet to be declared invalid and thus mercury emitted from oil- and coal-fired EGUs was not listed in Section 112, freeing up the states to regulate mercury emissions on their own as they saw fit.

The Commonwealth further claims that if we reject its approach, then the Board cannot rely on the state of federal law in effect at the time any other regulations may be promulgated, resulting in chaos. The Commonwealth observes that the EPA changes the Section 112(c) list of source categories from time to time, occasionally delisting a pollutant only to relist it later. The Commonwealth argues that the Commonwealth Court's approach invites extreme regulatory uncertainty. It notes that the Board is unable to predict the future,

and must be able to rely on the Section 112 list at the time the Board promulgates emissions regulations.

This regulatory uncertainty argument is not without some practical appeal, but ultimately it is unpersuasive for purposes of the case *sub judice*. The Delisting Rule was not eliminated because of one of the EPA's occasional alterations to the Section 112 source list. Rather, a federal court of appeals found that the Delisting Rule was invalid and the EPA has accepted that decision. Recognition of the inevitable effect of a federal court's invalidation of a federal regulation does not presage so much uncertainty that the Board will be prevented from properly exercising its regulatory function.

The Commonwealth claims that the *New Jersey* decision does nothing to disturb its snapshot-in-time approach. The Commonwealth argues that the Commonwealth Court mistakenly found that, as a result of the *New Jersey* decision, EGUs must be deemed to have always remained listed under Section 112. The Commonwealth states that this simply is not the case. It asserts that until the DC Circuit issued its order invalidating the Delisting Rule, mercury was indeed delisted from Section 112. The Commonwealth also notes that the DC Circuit never considered whether a state regulation predicated on the Delisting Rule should also fail, and thus, *New Jersey* does not speak to the instant state regulations.

The Commonwealth is correct that the DC Circuit did not consider whether a state regulation predicated on the Delisting Rule would also fail for the simple reason that the validity of a state regulation was not before the *New Jersey* court. Yet, the Commonwealth's argument misses a logical analogy which significantly undermines its position. The DC Circuit did consider whether the federal CAMR, which, like our PA Mercury Rule, was predicated on the Delisting Rule and was promulgated prior to the *New Jersey* decision, retained any validity. The DC Circuit squarely answered that it did not, finding that since CAMR sprang from the Delisting Rule, it must be invalidated because the Delisting Rule had failed. Likewise, if the PA Mercury Rule was permissible at all when it was adopted, that was only because of the existence

and effect of the Delisting Rule; once the Delisting Rule was found to have no validity, the authorization, and legal predicate for, the PA Mercury Rule evaporated according to the Commonwealth.

Continuing with its snapshot-in-time approach, the Commonwealth next argues that the Commonwealth Court improperly gave the *New Jersey* decision retroactive effect. It also argues that the Commonwealth Court improperly interpreted that decision as finding the Delisting Rule void *ab initio*. In support of its retroactivity argument, the Commonwealth focuses on state law concerns affecting retroactivity/prospectivity of new judicial rules as set forth in *Blackwell v. State Ethics Comm'n,* 527 Pa. 172, 589 A.2d 1094 (1991).

In *Blackwell,* this Court reiterated the general principle that courts will apply the law that is in effect at the time of an appellate decision; however, matters that are pending or are commenced after a new decision may be subject to the new judicial rule announced in that decision. But, there is no hard and fast rule on retroactivity. There are times when our Court will not apply a new judicial rule to those matters pending on appeal, but rather we will apply the new decision only to those matters commenced after the decision is handed down. In making a determination of the retroactive or prospective effect of new rules, we examine the purpose to be served by the new rule, the extent of reliance on the old rule, and the effect on the administration of justice that retroactive application of a new rule would have. *Blackwell,* 589 A.2d at 1099. The Commonwealth argues that these three factors in *Blackwell* militate against applying the DC Circuit's opinion in *New Jersey* retroactively; thus, it its view, the *New Jersey* decision should merely be construed as limiting the Board's authority to promulgate new regulations.

The Commonwealth's argument is inapt for multiple reasons. First, as appellees trenchantly observe, the Commonwealth "fail[s] to explain how applying the *New Jersey* decision to a case filed after that decision was rendered constitutes retroactive application." Appellees' Brief at 20. As this litigation was commenced after the *New Jersey* decision was hand-

ed down, there is no question here regarding retroactive application of that decision.

Equally fundamental, however, is the fact that the issue posed is not simply a question of this Court determining the scope of a new judicial rule of our own devising. Rather, the issue requires us to assess the consequences of a successful federal judicial challenge to a federal regulation, which has since come to be accepted by the federal regulatory agency in charge, and which has an obvious and inevitable effect upon the very power of the states to act consistent with the federal Supremacy Clause. We cannot ignore these federalism concerns and decide the case as if the concerns identified in *Blackwell* exhaust the considerations involved. The *New Jersey* decision, and the EPA's reaction to it, establish the federal regulatory scheme in existence, and that reality has a direct effect upon the power of the states in this area, implicating the PA Mercury Rule, which we cannot ignore.

The Commonwealth also forwards a series of arguments regarding whether the Commonwealth Court properly interpreted the Delisting Rule as void *ab initio*. The Commonwealth asserts that during the period between the promulgation of the Delisting Rule and the *New Jersey* decision, the Delisting Rule was not treated as void *ab initio* by the states, the EPA, or industry. But the fact that those entities did not treat the Delisting Rule as void during that period is of no moment to this Court's task because, during that time period, the Delisting Rule had yet to be invalidated by the DC Circuit. It goes without saying that no one would reasonably treat it as void *ab initio* during that period.

The Commonwealth also asserts that the *New Jersey* court itself did not consider the Delisting Rule to be void *ab initio*, but merely concluded that the Delisting Rule was invalid as of the date of the decision. The Commonwealth thusly implies that the *New Jersey* decision stands for the proposition that the Delisting Rule was and remains valid from the date of its inception until the day the *New Jersey* court declared it invalid. This reading of the *New Jersey* decision is untenable. As noted above, the *New Jersey* court found that CAMR was

invalid because, when it was enacted, it was premised on the Delisting Rule. CAMR was promulgated well before the *New Jersey* decision. Obviously, if the *New Jersey* court had merely found that the Delisting Rule was invalid only from the date of its decision, it would not have invalidated CAMR.

Moreover, the Commonwealth's argument is impractical. Section 112 of the Clean Air Act occupied the field both before and after the Delisting Rule. The notion that a state regulation adopted in the interregnum, but which would have future effect, can stand outside the scheme by virtue of some grandfathering principle is unworkable in a federal system.

Additionally, in its Reply Brief, the Commonwealth urges that we should adopt a narrow approach to the void *ab initio* doctrine. Relying on *Glen–Gery Corp. v. Zoning Hearing Bd. of Dover Twp.*, 589 Pa. 135, 907 A.2d 1033 (2006), the Commonwealth claims that an invalidated statute will be treated as void *ab initio* only if the provision implicated notice, due process or other constitutional rights of a party and, since none of those constitutional rights is implicated here, the Delisting Rule cannot be seen as void *ab initio*. The Commonwealth argues that certain invalid municipal ordinances have been treated as void *ab initio* in instances where the time period for challenging the ordinance has run. Commonwealth's Reply Brief at 7–8 (citing, *inter alia, Schadler v. Zoning Hearing Bd. of Weisenberg Twp.*, 578 Pa. 177, 850 A.2d 619 (2004)). The Commonwealth observes that the PA Mercury Rule is not a municipal ordinance, and asserts that there is no time limit for challenging the PA Mercury Rule.[10] Additionally, the Commonwealth states that *Glen–Gery* held that the void *ab initio* doctrine should not be applied when a citizen who relied on the invalid provision would be harmed by declaring it void *ab initio*. The Commonwealth argues that enormous reliance was placed on the Delisting Rule by the EPA, the Commonwealth, other states, and industry, and thus we should not find the Delisting Rule void *ab initio*.

**10.** Notably, the Commonwealth also has argued that appellees' objections to the PA Mercury Rule were not raised promptly, and therefore they are waived.

This argument fails. The salient inquiry is not whether this Court would have declared the Delisting Rule void *ab initio*. This Court did not strike the Delisting Rule; the *New Jersey* court did, and the EPA has accepted that result. And, in striking the Delisting Rule, the *New Jersey* court clearly treated it as if it had no validity from the moment it was promulgated. This Court cannot somehow reanimate the Delisting Rule, and thereby ignore the effect of federal agency law, as determined by the federal courts and the EPA, upon Pennsylvania regulatory efforts.

In sum, there is no question that the PA Mercury Rule was promulgated when the Delisting Rule had yet to be declared invalid. Yet, the Commonwealth's time-specific argument misses the broader picture. The *New Jersey* court, which issued what proved to be the final word on the validity and effect of the Delisting Rule, found that the Delisting Rule was invalid from its inception. Thus, however well-intentioned the PA Mercury Rule was at the time of its promulgation, the foundation for the Board's promulgation of the Rule proved to be evanescent. This Court cannot ignore that reality. Furthermore, as reflected in the *New Jersey* decision's invalidation of CAMR, regulations predicated on the Delisting Rule opening the door to state regulation must necessarily fall given that the door has since been closed shut. Therefore we find that the Commonwealth Court did not err in resolving these issues.

█ Finally, the Commonwealth argues that Appellees were not entitled to pre-enforcement review of the PA Mercury Rule in the first place.[11] As noted above, the effective date

11. Appellees assert that the Commonwealth waived this issue as it did not raise the pre-enforcement review question in the Jurisdictional Statement filed in this Court. Thus, per Pa.R.A.P. 910(a)(5), the issue is waived.

Rule 910(a)(5) states that we will consider only those questions set forth in the Jurisdictional Statement, or those issues that are "fairly comprised therein...." Pa.R.A.P. 910(a)(5). The Commonwealth's third issue in its Jurisdictional Statement is: "Should the Commonwealth Court's Order enjoining the Commonwealth from continued implementation and enforcement of the Pennsylvania-specific Mercury Rule be reversed?" This broadly-worded issue arguably encompasses

of the PA Mercury Rule is January 1, 2010, and this litigation commenced on September 15, 2008. The Commonwealth observes that pre-enforcement review is available only if an adequate administrative remedy is not available. Commonwealth's Brief at 52 (citing *Arsenal Coal, supra* ). The Commonwealth asserts that Judge Pellegrini improperly applied *Arsenal Coal.* The Commonwealth reasons that, unlike the petitioners in *Arsenal Coal,* appellees are not immediately subject to the requirements of the PA Mercury Rule; indeed, they will not be subject to the Rule until the Department issues a plan approval or operating permit that incorporates the mercury-emission limitations. Thus, the Commonwealth asserts that appellees' petition for review was prematurely filed, and instead, appellees should have pursued an administrative remedy once a plan approval or operating permit was issued. The Commonwealth concludes that the Commonwealth Court lacked jurisdiction, and should have granted its preliminary objections on that ground.

The Commonwealth relies on *Duquesne Light Co. v. Com., Dept. of Environmental Protection,* 724 A.2d 413 (Pa.Cmwlth. Ct.1999) as additional support for its pre-enforcement review argument. In that case, Duquesne Light launched a pre-enforcement challenge to the validity of a regulation controlling nitrogen oxide ("NOx") pollution. The Commonwealth Court found that Duquesne Light had not met the *Arsenal Coal* standard because it was speculative whether, and how much, regulation Duquesne Light would be subject to, since the Department had the discretion to grant allowances for NOx pollution at the time of permitting. As the Department had yet to issue operating permits, the potential harm to Duquesne Light was purely speculative. The Commonwealth argues that, like *Duquesne Light,* this case involves a pre-enforcement challenge to a pollution regulation; thus, appellees should proceed through the administrative review process.

the pre-enforcement issue. Furthermore, the Commonwealth raised the pre-enforcement issue before the Commonwealth Court. The waiver forwarded, even if deemed plausible, is not one involving a lapse impeding effective appellate review. Thus, we will reach the merits.

The Commonwealth adds that appellees are not subject to immediate enforcement, and that their purported harm is merely speculative. It concedes that Appellees have a hard-target number of reducing their emissions by 80% from January 1, 2010 through December 31, 2014. Yet, the Commonwealth states that even this amount is not certain because appellees may be excused from that requirement if they can prove that the reduction requirements are economically or technologically infeasible. The Commonwealth states that until appellees submit an application, and a determination is made on that application, appellees have not proven any immediate harm.[12]

Appellees counter that exhaustion of administrative remedies is not required when a statutory or regulatory scheme's very validity is being challenged. Appellees' Brief at 38 (citing, *inter alia*, *Empire Sanitary Landfill v. Dept. of Environmental Resources*, 546 Pa. 315, 684 A.2d 1047 (1996) (administrative adjudicative body does not have power to grant declaratory judgment and injunctive relief pursuant to Declaratory Judgment Act, 42 Pa.C.S. § 7531 *et seq.*, because only courts have that jurisdiction.))

Appellees also disagree with the Commonwealth's contention that their harm is speculative. Appellees note that if they are forced to go through the administrative review process, they will have to continue to bring their facilities into compliance with the PA Mercury Rule standards and that such an effort costs millions of dollars. They further note that if the

12. The Commonwealth further notes that appellees may also apply for a credit from their removal of mercury via pretreatment of coal or coal refuse, and since they have yet to do so, their harm is speculative. We will reject that argument summarily. This future possibility invoked by the Commonwealth is itself speculative. What is certain, however, is that coal-fired EGUs must effectuate an 80% reduction in mercury emissions within the next five years. Also, the Commonwealth conceded in its Application for Reinstatement of Automatic Supersedeas that appellees necessary future expenditures to be in compliance with the PA Mercury Rule will run into the tens of millions of dollars. While a future, possible credit may make it easier for Appellees to meet their 80% reduction target, that speculative credit does not make it any less certain that appellees will be spending enormous sums of money to come into compliance.

EPA ultimately develops mercury emission control standards that require implementation of different technology, the sums expended in pursuit of distinct PA Mercury Rule requirements will be for naught. Those avoidable costs would have to be absorbed by the owners of the coal-fired EGUs or passed along in the form of higher utility costs for Pennsylvania consumers, resulting in either irreparable harm to the owners of the coal-fired EGUs or a negative impact on the public. Relying on *Arsenal Coal*, appellees observe that we have held that a pre-enforcement challenge is appropriate when compliance is costly and otherwise burdensome, *i.e.*, where awaiting "judicial determination of validity in subsequent piecemeal litigation ... would be costly and inefficient." *Arsenal Coal*, 477 A.2d at 1340.

Additionally, appellees argue that the administrative remedy the Commonwealth poses would be inadequate. Appellees posit that they could fail to comply with the PA Mercury Rule and then, after presumably being found in violation as of January 1, 2010, they could file an administrative appeal. Appellees state that we recognized in *Arsenal Coal* that if the open avenue for administrative relief is planned noncompliance, a party is placed in an unacceptably untenable position.

Appellees also distinguish *Duquesne Light* on the basis that the petitioner there made no factual allegation that it was obliged to immediately spend large sums of money in the pre-enforcement period. Thus, there was no allegation of pre-enforcement immediate harm. Appellees argue that *Duquesne Light* is in sharp contrast to their present situation, since they have shown that they will have to spend multiple millions of dollars to be in compliance with what they have good reason to believe is an invalid Rule. Appellees further observe that, while the Commonwealth disagrees about the amount appellees will have to expend pre-enforcement, it does not, and cannot, claim that appellees need make no significant pre-enforcement expenditures.

The Commonwealth's pre-enforcement review argument lacks merit. *Arsenal Coal* broadly stated that "the propriety of invoking the original equitable jurisdiction of the Common-

wealth Court in a case seeking pre-enforcement review of a substantial challenge to the validity of regulations promulgated by an administrative agency is clear." *Arsenal Coal,* 477 A.2d at 1338. *Arsenal Coal* further explained that when the challenged regulations have a "direct and immediate" effect on the industry, a challenge may be brought pre-enforcement. *Id.* at 1339. Considering the undisputed, substantial sums being expended by appellees and other coal-fired EGUs in order to comply with the PA Mercury Rule, this pre-enforcement challenge is appropriate under *Arsenal Coal.* At a minimum, the Commonwealth Court did not clearly err in entertaining the pre-enforcement challenge here.

In summary, there is no dispute that mercury is a pernicious pollutant, and limiting and controlling mercury emissions through valid regulation is desirable. Yet, logically the PA Mercury Rule simply cannot stand following *New Jersey.* The Commonwealth's arguments, at heart, evince an understandable, but ultimately legally weak, frustration at the bind in which the Commonwealth is placed when a challenge in the federal regulatory system and resulting litigation introduces this kind of uncertainty respecting the role the states may play. By the same token, however, those subject to a regulatory scheme where federal authorities can and have acted, should not have to choose between two schemes at their peril. At the end of the day the Commonwealth simply cannot prevail on the arguments forwarded here.

For the foregoing reasons, the order of the Commonwealth Court is affirmed.