FILED
United States Court of Appeals
Tenth Circuit

August 10, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WILDEARTH GUARDIANS, a New
Mexico non-profit corporation,

Plaintiff-Appellant,

v.

PUBLIC SERVICE COMPANY OF
COLORADO, doing business as XCEL
ENERGY,

Defendant-Appellee.

No. 11-1400

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:09-CV-01576-WDM-KLM)**

---

Maclain Joyce, Student Attorney (Professor Kevin Lynch, Supervisor, and Professor
Michael Ray Harris with him on the briefs, and Casey Giltner, Student Attorney, with
him on the opening brief), Environmental Law Clinic, University of Denver Sturm
College of Law, Denver, Colorado, for Appellant.

William M. Bumpers, Baker Botts L.L.P., Washington, District of Columbia (A. Kent
Mayo and Michael Heister, Baker Botts, L.L.P., Washington, District of Columbia, and
Colin C. Deihl, Ann E. Prouty, and Linda L. Rockwood, Faegre Baker Daniels LLP,
Denver, Colorado, with him on the brief), for Appellee.

---

Before **O'BRIEN**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

The question in this case is whether allegations that Public Service Company of Colorado (PSCo) violated the Clean Air Act have become moot. WildEarth Guardians claims that PSCo's construction of a new coal-fired power plant in Pueblo, Colorado violated the Act because PSCo failed to obtain a valid construction permit. WildEarth seeks civil penalties to remedy the violation.

Although the project initially complied with all applicable federal and state laws when construction commenced in 2005, the regulatory landscape changed in 2008. A decision of the D.C. Circuit required regulators to impose additional Clean Air Act requirements upon new power plant construction. After the decision, PSCo worked with the relevant agencies to come into compliance with the modified regulatory regime while construction of the plant continued.

WildEarth sued PSCo pursuant to the Act's citizen-suit provisions, seeking civil penalties and an injunction to halt construction until PSCo complied with the Act. While this litigation was pending, PSCo finished constructing the plant and came into compliance with the new regulatory regime. The district court dismissed the suit, reasoning that to find a Clean Air violation under the circumstances would be to give unwarranted retroactive effect to the decision of the D.C. Circuit.

PSCo argues that we lack jurisdiction to hear this appeal. It contends that since it is now in compliance with the Act, a court ruling could not redress any injuries WildEarth has suffered as a result of PSCo's alleged violation. PSCo also argues WildEarth in effect

has received the injunctive relief it requested because PSCo is now in compliance.

Although we find redressability to be an inappropriate basis for dismissal here, WildEarth's claims nonetheless should be dismissed under the related jurisdictional doctrine of constitutional mootness. In most Clean Air citizen suits, mootness is difficult to establish because the plaintiff's interest in deterring the defendant from future violations is sufficient to sustain a constitutional case or controversy between the parties. Under the unusual circumstances of this case, however, we find PSCo's alleged Clean Air violations could not reasonably be expected to recur, and thus no deterrent effect could be achieved.

Accordingly, we find this appeal moot and DISMISS.

## I.  Statutory and Regulatory Background

A brief overview of the applicable statutory and regulatory framework will help to explain WildEarth's claims. It will also show how the applicable regulations in this case shifted over the years during which PSCo conceived and constructed the plant.

The regulation of power plant mercury emissions under the Clean Air Act has a long and complex history. In 1970, Congress added section 112 to the Act, which required the Environmental Protection Agency (EPA) to develop a list of Hazardous Air Pollutants that should be regulated because they could cause illness, and to promulgate emissions standards for them. Pub. L. No. 91-604 § 112(a)(1). In 1990, frustrated by the EPA's slow progress, Congress amended section 112 to require the EPA to regulate more than one hundred specific pollutants, including mercury. Congress specified that

3

pollutant standards must "require the maximum degree of reduction in emissions . . . that the [EPA] Administrator, taking into consideration the cost of achieving such emission reduction . . . determines is achievable." § 112(d)(2). New sources of pollutants falling within a list of regulated source categories must utilize "the maximum achievable control technology emission limitation" (MACT), and for pollutants for which standards have not yet been established, the permitting authority determines MACT compliance "on a case-by-case basis." § 112(g)(2)(A).[1] Congress also restricted the EPA's ability to remove source categories from the list of regulated sources, requiring it first to determine that "emissions from no source in the category . . . exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source." § 112(c)(9).

The 1990 amendment contained special rules for new electric utility steam generating units, such as the coal-fired power plant at issue here. Congress did not require the EPA to immediately regulate coal plants; instead, it required the EPA to "perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by [coal plants] of pollutants." § 112(n)(1)(A). The Administrator would be required to regulate coal plant emissions only if he found "such regulation is appropriate and necessary after considering the results of the study." *Id.*

The required emissions study, completed in 1998, found "a plausible link between

_____

[1] Because the Act employs a "cooperative federalism" approach, the relevant permitting authority in this case is the Colorado Department of Public Health and Environment.

4

anthropogenic releases of mercury from industrial and combustion sources in the United States and methylmercury in fish" and that "mercury emissions from [coal plants] may add to the existing environmental burden." KATHRYN MAHAFFEY ET AL., U.S. EPA, EPA-452/R-97-009, MERCURY STUDY REPORT TO CONG., Vol. VII, 45 (1997), *available at* http://www.epa.gov/ttn/oarpg/t3/reports/volume7.pdf.[2] In 2000, the Administrator, in light of the 1998 study, found it was "appropriate and necessary" to regulate mercury emissions from coal plants, and formally added coal plants to the list of source categories. Regulatory Finding on the Emissions of Hazardous Air Pollutants From Electric Utility Steam Generating Units, 65 Fed. Reg. 79,825, 79,827 (Dec. 20, 2000).

The EPA considered two main alternatives for regulating coal plant mercury emissions. The first alternative was through issuance of MACT standards under section 112. The second was the creation of a mercury cap-and-trade system. This second option would involve removing coal plants from the list of source categories under section 112 and regulating them under a different section of the Act. In 2005, in a decision referred to as the "Delisting Rule," the EPA chose the cap-and-trade option.

The Delisting Rule was controversial and was challenged by the state of New Jersey in federal court. In 2008, a panel of the D.C. Circuit struck down the Delisting Rule. *See New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008). The court found that the EPA, in delisting coal plants, had not followed the delisting procedures required by

_____

[2] Although this report is dated December 1997, EPA's official website indicates the report was finalized on January 9, 1998. *See* U.S. EPA (July 23, 2012), http://www.epa.gov/ttn/oarpg/t3rc.html.

5

section 112(c)(9) of the Act.  This decision restored the regulation of coal plant mercury emissions under section 112's "case-by-case determination" process.

Finally, in 2012, the EPA formally issued MACT standards for coal plant mercury emissions.  *See* National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, 77 Fed. Reg. 9304 (Feb. 16, 2012).  The new standards, known as the Mercury and Air Toxics Standards, specified the control technologies required for new coal plants, thereby eliminating the need for case-by-case MACT determinations.

Although federal and state authorities have primary enforcement responsibility, the Clean Air Act also includes a private enforcement mechanism.  Section 304 authorizes "any person" to "commence a civil action on his own behalf . . . against any person who proposes to construct or constructs any new or modified major emitting facility without a permit."  CAA § 304(a).  Courts may award both injunctive relief and civil penalties.  *See id.*  The penalties, however, are payable to the United States Treasury rather than plaintiffs, who can only recover their litigation costs.  *See* §§ 304(g)(1), 304(d).  The court, in its discretion, may designate a portion of the penalties to "be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment."  § 304(g)(2).

## II. Factual and Procedural History

In the midst of this evolving regulatory environment, PSCo sought to build a new coal plant, known as the Comanche 3 Unit, at the Comanche Generating Station in Pueblo, Colorado. From the project's conception, PSCo worked with several major environmental and community groups to implement a plan that would enable the Comanche 3 Unit to meet or exceed Clean Air requirements. In December 2004, PSCo reached a formal settlement with these groups, in which PSCo agreed to install "state-of-the-art pollution controls," Supp. App. at 30, including mercury controls equal to or exceeding the MACT standards proposed by the EPA prior to the Delisting Rule.[3] PSCo also agreed to install new mercury controls and other pollution controls on two older coal plants at the Comanche Generating Station.

PSCo's revised permit application, submitted in January 2005, incorporated the settlement and requested a case-by-case MACT determination. But, in March 2005, the EPA issued the Delisting Rule, making a MACT determination unnecessary. As a result, the final construction permit, issued in July 2005, did not contain a MACT determination. PSCo began construction in October 2005, and planned to complete the Comanche 3 Unit by 2009. Notwithstanding the Delisting Rule, PSCo honored its settlement with the environmental groups and constructed the plant with the agreed-upon pollution controls.

---

[3] WildEarth was not a party to the settlement agreement.

The Comanche 3 Unit was still under construction in February 2008, when the D.C. Circuit struck down the Delisting Rule.[4]  In January 2009, the EPA issued a memorandum to its regional administrators requesting that state permitting authorities commence a process to make new MACT determinations for under-construction plants permitted under the Delisting Rule.  The EPA expressed the view that plant builders without a MACT determination were obliged to obtain one, but did not require them to halt construction before doing so.

Over the next several months, PSCo worked with Colorado authorities to determine what new action would be required, and PSCo agreed to revise and supplement the original MACT analysis it had submitted in January 2005 to reflect technological advances since that time.  Meanwhile, construction work on the Comanche 3 Unit continued.

In July 2009, the same month PSCo submitted its revised MACT analysis, WildEarth sued PSCo, claiming that PSCo's ongoing construction of the Comanche 3 Unit without a MACT determination violated section 112 of the Act.  WildEarth sought injunctive relief, in the form of halting construction until PSCo received a valid MACT determination, as well as civil penalties, attorney's fees, and a declaratory judgment.

_____

[4]  The D.C. Circuit denied rehearing en banc in May 2008, and the Supreme Court denied certiorari in February 2009.

In late 2009, PSCo finished construction of the Comanche 3 Unit and commenced operations. Finally, in February 2010, PSCo received a final MACT determination from the Colorado Department of Public Health and Environment.

The court below dismissed WildEarth's suit, finding that the change in law would not apply retroactively to the plant construction. The district court found that applying the D.C. Circuit's ruling to the ongoing construction of the Comanche 3 Unit would constitute retroactive application since PSCo obtained its permit under the prior regulatory regime, and that retroactive application would be highly inequitable given PSCo's efforts to comply with MACT standards both before the Delisting Rule and after the Rule was struck down.[5]

## III. Jurisdiction

### A. *Standard of Review*

Before proceeding to the merits of WildEarth's challenge, we must find that this case satisfies the jurisdictional requirements of Article III of the Constitution. Although

---

[5] Because we dismiss the case on other grounds, we will not review the merits of the district court's retroactivity finding. We note, however, that other courts have confronted this issue in the wake of the *New Jersey* decision and concluded that the retroactivity doctrine is not applicable to any construction activity occurring *after* that decision was finalized. *See Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 143 (5th Cir. 2010) ("[T]he district court seemed to assume that to find a violation of § 112(g)(2)(B), it would have to retroactively apply *New Jersey*, but that is not the case."); *WildEarth Guardians v. Lamar Utils. Bd.*, 2010 WL 3239242, *6 (D. Colo. 2010) ("Once the *New Jersey* decision was issued . . . assessing penalties for a failure to seek a MACT determination after that point would not be to apply the case retroactively.").

the jurisdictional issues we consider were not discussed in the court below, it is appropriate for us to consider jurisdiction for the first time on appeal. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009). Because jurisdiction is a legal issue, our review is de novo. *Natural Gas Royalties Qui Tam Litig. v. Pac. Gas & Elec. Co.*, 562 F.3d 1032, 1038 (10th Cir. 2009).

As we explain below, we conclude WildEarth's claims are moot and thus do not reach the merits.

## B. Redressability and Mootness

The Constitution limits the exercise of the judicial power to "cases" and "controversies." U.S. CONST. art. III, § 2. Thus, "[w]ithout a live, concrete controversy, we lack jurisdiction to consider claims no matter how meritorious." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (quoting *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008)). Here, we examine two aspects of Article III jurisdiction: standing—in particular, its redressability prong—and constitutional mootness.

### 1. Redressability

"Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court." *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004). "Standing is determined as of the time the action is brought." *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006). "To establish Article III standing, the

plaintiff bears the burden of demonstrating the following three elements: (1) an injury in fact; (2) a causal connection between the injury and the challenged action; and (3) *a likelihood that a favorable decision will redress the injury*." *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) (emphasis added). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

"To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury." *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005). In addition, the plaintiff must demonstrate that a favorable judgment would have a binding legal effect. *See Turner v. McGee*, 681 F.3d 1215, 1218 (10th Cir. 2012). A showing that the relief requested *might* redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement, *see, e.g.*, *Utah v. Babbitt*, 137 F.3d 1193, 1213 (10th Cir. 1998), but may suffice if the alleged injury is a procedural one, *see, e.g.*, *id.* at 1216.

### 2. Mootness

Mootness, like standing, is a jurisdictional doctrine originating in Article III's "case" or "controversy" language. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352

-11-

(2006).[6]  Thus, "[w]hen a civil case becomes moot pending appellate adjudication, '[t]he established practice . . . in the federal system . . . is to reverse or vacate the judgment below and remand with a direction to dismiss.'"  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)).

Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the elements of standing during litigation; thus, courts have sometimes described mootness as "the doctrine of standing set in a time frame."  *Id.* at 68 n.22 (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980).  This description, however, "is not comprehensive."  *Laidlaw*, 528 U.S. at 190.  Rather, mootness, though analytically similar to standing, differs in two significant ways.

First, mootness doctrine is subject to an exception that sometimes allows courts to retain jurisdiction even if one or more of the elements of standing is lost; namely, when "defendant's allegedly unlawful activity is 'capable of repetition, yet evading review.'"  *Id.*  Such situations arise, for example, when a plaintiff has been subjected to multiple instances of unlawful action in the past, and can demonstrate a likelihood of future repetition.  *See, e.g.*, *Olmstead v. L.C.*, 527 U.S. 581, 594 (1999) (applying exception to

---

[6]  Mootness doctrine also encompasses a prudential aspect that gives courts the discretion to dismiss a case under certain circumstances even when constitutional jurisdiction is unquestionably satisfied.  *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012).  Because prudential mootness involves a somewhat different set of concerns, we confine our discussion here to constitutional mootness.

mentally-ill plaintiff challenging repeated institutionalization).  This exception is unique to the mootness context; "[s]tanding admits of no similar exception."  *Laidlaw*, 528 U.S. at 191.

Second, although the plaintiff bears the burden of demonstrating standing, the defendant bears the burden of proving mootness.  *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221 (2000).  Sometimes this task is straightforward, "as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died."  *Laidlaw*, 528 U.S. at 192.  But sometimes mootness relies on contested facts, particularly where the likelihood of future harm is at issue.  *See id.* at 190 (citing examples).  In such cases, the defendant may be unable to show mootness, even if the facts at that point would not have been sufficient for the plaintiff to demonstrate standing at the start of the case.  *See Adarand*, 528 U.S. at 222.

The defendant's burden is even greater when the defendant moots the case by voluntarily ceasing its offending conduct.  *See id.*  Courts recognize that defendants "should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."  *Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.,* 491 F.3d 1143, 1149 (10th Cir. 2007) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)).  Thus, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Laidlaw*, 528 U.S. at 190.

### 3. Special Issues With Citizen-Suit Provisions

Redressability and mootness doctrines encounter special problems in the context of citizen suits in which the only available relief is a penalty payable to the government. Although such penalties may vindicate the public interest, they do not directly redress any injuries unique to the citizen-plaintiff.

Two Supreme Court cases provide guidance: (1) *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), and (2) *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000). A brief description of each will illustrate the proper jurisdictional analysis here.

In *Steel Co.*, the Supreme Court considered the citizen-suit provisions of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA). Under this act, users of toxic and hazardous chemicals are required to file annual chemical inventory forms with local and state authorities. *See Steel Co.*, 523 U.S. at 86. EPCRA authorizes citizen suits against violators if the EPA fails to pursue an administrative or civil action against the violator after 60 days of receiving notice of the violation, and authorizes civil penalties to be paid only to the United States Treasury. *See id.* at 106. The citizen-plaintiff discovered that the defendant, a user of toxic chemicals, had not filed the required forms from 1988 through 1995. The plaintiff notified the EPA and the defendant of the violation. Before the 60-day window had lapsed, the defendant filed all the appropriate forms, thereby complying with the statute. The EPA declined to bring an enforcement action, so the plaintiff sued.

-14-

The Supreme Court ruled that jurisdiction was improper because the plaintiff failed to satisfy the redressability prong of standing. The Court found that the civil penalties requested by the plaintiff were insufficient to support standing at the time the suit was filed because, "[i]n requesting them, . . . respondent seeks not remediation of its own injury . . . but vindication of the rule of law—the 'undifferentiated public interest' in faithful execution of EPCRA." *Id.* at 106 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992)). The Court also found the plaintiff's request for injunctive relief—in the form of access to various records of the defendant—insufficient because it would not do anything to remedy the past harm the plaintiff alleged it had suffered. *See id.* at 108. While the Court acknowledged the possibility that such relief could "deter[] petitioner from violating EPCRA in the future," it nonetheless found such relief would not remedy any injury because plaintiff had not "alleged a continuing violation or the imminence of a future violation." *Id.* Without such an allegation, the plaintiff's "generalized interest in deterrence . . . is insufficient." *Id.* at 108–09.

The Supreme Court also rejected the argument of the United States, as *amicus curiae*, "that the injunctive relief does constitute remediation because there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation." *Id.* at 109 (alteration in original) (internal quotation marks omitted). The Court explained that this presumption only applies to rebut a defendant's claim of mootness when the defendant ceases illegal activity *after* the plaintiff files suit. *See id.* The Court went on to find the presumption inapplicable to

standing analysis:

> It is an immense and unacceptable stretch to call the presumption into service as a substitute for the allegation of present or threatened injury upon which initial standing must be based. . . . "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."

*Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496–97 (1974)).

Two years later, in *Laidlaw*, the Supreme Court arrived at a different result. There, the plaintiff sued under the citizen-suit provisions of the Clean Water Act, which, like the citizen-suit provisions of EPCRA and the Clean Air Act, required civil penalties to be paid only to the United States Treasury. *See Laidlaw*, 528 U.S. at 173. The plaintiff alleged that Laidlaw, the operator of a wastewater treatment plant, had failed to comply with mercury discharge limits in its Clean Water permit. *See id.* at 175. Laidlaw, unlike the defendant in *Steel Co.*, continued certain violations after the plaintiff filed suit; however, at some point during the course of litigation, Laidlaw "achieved substantial compliance with the terms of its . . . permit." *Id.* at 173. Due to Laidlaw's compliance, the district court denied the plaintiff's request for injunctive relief. The court, however, did assess a civil penalty, finding that "[t]he total deterrent effect of the penalty would be adequate to forestall future violations." *Id.* (internal quotation marks omitted). Both parties appealed the ruling on civil penalties, but neither party appealed the ruling on injunctive relief. *See id.* at 179.

The court of appeals found that, even assuming the plaintiff had standing at the start of the suit, the case became moot once Laidlaw came into compliance with the Clean

Water Act.  *See id.*  The court believed "that the elements of Article III standing—injury, causation, and redressability—must persist at every stage of review, or else the action becomes moot."  *Id.*  Relying on *Steel Co.*, the circuit held "that the case had become moot because 'the only remedy currently available to [the plaintiff]—civil penalties payable to the government—would not redress any injury [plaintiff had] suffered.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 149 F.3d 303, 306 (4th Cir. 1998)).

The Supreme Court reversed.  First, it examined standing.  The Court found that the plaintiff's interest in deterrence was sufficient to satisfy redressability: "for a plaintiff who is injured or faces the threat of future injury due to illegal conduct *ongoing at the time of suit*, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress."  *Id.* at 185–86 (emphasis added).  But the Court also recognized "*that there may be a point at which the deterrent effect of a claim for civil penalties becomes so insubstantial or so remote that it cannot support citizen standing.*" *Id.* at 186.  The case did not require the Court to "explore the outer limits of [this] principle" because "[h]ere, the civil penalties sought by [the plaintiff] carried with them a deterrent effect that made it likely, as opposed to merely speculative, that the penalties would redress [the plaintiff's] injuries by abating current violations and preventing future ones."  *Id.* at 187.  The Court distinguished *Steel Co.* based on when the offending conduct stopped; there, the alleged violations had wholly abated by the time the plaintiff filed suit.  *See id.* at 188.

The Court then turned to mootness. The Court observed, "[t]he only conceivable basis for a finding of mootness in this case is Laidlaw's voluntary conduct—either its achievement . . . of substantial compliance with its . . . permit or its more recent shutdown" of the polluting facility. *Id.* at 189. Accordingly, the Court applied a "stringent" standard: "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). Despite the closure of the offending facility, the Court found it was "far from clear" whether this standard was met, *id.* at 194 n.6; the Court noted that Laidlaw retained its permit, and that "[t]he effect of both Laidlaw's compliance and the facility closure on the prospect of future violations is a disputed factual matter," *id.* at 193. Thus, the Court remanded this issue for reconsideration. *See id.* at 194.

Viewed together, *Steel Co.* and *Laidlaw* illustrate the functional distinctions between redressability and mootness in the citizen-suit context. The plaintiff bears the burden to establish standing at the time the suit is filed, and if the defendant's offending conduct has ceased by that time, we dismiss for lack of redressability. But if the offending conduct ceases after the suit is filed, the defendant must establish mootness by showing that its offending conduct "could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189.

## C. *Application to WildEarth's Claims*

Applying the jurisdictional principles discussed above, we examine WildEarth's claims to determine if any can survive.

WildEarth asserted two principal claims for relief under the Clean Air Act: (1) civil penalties; and (2) injunctive relief against "construction or operation of Comanche Unit 3 until and unless [PSCo] complies with the Clean Air Act and any applicable regulatory requirements." Compl. at 10, *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 805 F. Supp. 2d 1134 (D. Colo. 2011) (No. 09-cv-1576). In addition, it sought a declaratory judgment, attorney's fees and litigation costs, and "other relief as the Court deems just and proper." *Id.*

PSCo now argues that we must dismiss due to lack of redressability because it is in full compliance with the Act. At the time WildEarth filed suit, however, PSCo had not obtained a MACT determination. As explained above, "[s]tanding is determined as of the time the action is brought." *Utah Ass'n of Counties*, 455 F.3d at 1099. At the time it was filed, WildEarth's suit, if meritorious, could have "abat[ed] [PSCo's] current violations." *Laidlaw*, 528 U.S. at 188. Thus, WildEarth had standing to bring the suit.

PSCo's arguments nonetheless must be considered under the mootness doctrine. As explained above, a defendant's compliance with the law may moot the case if the defendant shows it is "absolutely clear" that its conduct "could not reasonably be

expected to recur," thereby negating the potential deterrent value of the suit. *Laidlaw*, 528 U.S. at 189. We therefore proceed to analyze WildEarth's claims under that standard.

### 1. Civil Penalties

As discussed above, in most citizen suits, a plaintiff's claim for civil penalties is not rendered moot by the defendant's compliance with the law because the plaintiff retains a concrete interest in deterring the defendant from future violations. This case is a rare exception. Under the unusual circumstances present here, *Laidlaw*'s "absolutely clear" standard is met. PSCo's alleged Clean Air Act violation—constructing a coal plant without a MACT determination—could not reasonably be expected to recur.

First, PSCo's alleged non-compliance with the Act was precipitated by events entirely outside its control. Typically, a Clean Air violation will come about because a defendant intentionally or accidentally violates the terms of a permit or operates without one. Here, however, PSCo's permit was unquestionably valid at the time it began construction in 2005, and only became allegedly invalid once the D.C. Circuit's 2008 *New Jersey* decision struck down the Delisting Rule and reinstated the MACT requirement. Thus, nothing here indicates a history or pattern of MACT violations warranting a deterrent; rather, the alleged violation here was a one-off event caused by an unanticipated change in the law.

Second, PSCo made all reasonable efforts to comply with the Act, and even went above and beyond what was required in attempting to accommodate environmental

interests.  Before construction began, PSCo reached a settlement agreement with the State of Colorado and several prominent environmental organizations in which it agreed to mercury controls beyond what the law then required.  PSCo applied for a MACT determination with the agreed-upon standards, but, due to the Delisting Rule, state regulatory officials never issued a MACT determination.  Then, when the MACT requirement was reinstated by the *New Jersey* decision, PSCo worked with state and federal authorities to come into compliance with the reimposed regulatory requirements.  And, in any event, PSCo's construction already included the mercury controls specified in the 2004 settlement agreement.  These compliance efforts weigh significantly against finding that the violation here—construction without a MACT determination—could reasonably be expected to recur.

It is *possible* PSCo could have done more; in an overabundance of caution, it could have halted all construction on the Comanche 3 Unit until it obtained a MACT determination, despite the fact that no state or federal authority ever suggested such action was required.[7]  Doing so, of course, would have resulted in significant costs and delay.

_____

[7] Some cases addressing coal-fired plants in other courts have since held that failure to halt construction can violate the Clean Air Act.  *See Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 142 (5th Cir. 2010); *WildEarth Guardians v. Lamar Utils. Bd.*, No. 09-CV-02974, 2010 WL 3239242, at *6 (D. Colo. Aug. 13, 2010).  But PSCo did not have the benefit of those cases at the time.  More importantly, neither of those cases discussed mootness because the defendants, unlike PSCo, still had not obtained a MACT determination.  *See Sandy Creek*, 627 F.3d at 140; *Lamar*, 2010 WL 3239242 at *5.  Thus, they are not relevant to the critical issue here: whether civil penalties would deter PSCo from future violations.

That PSCo instead chose to work towards Clean Air Act compliance while continuing construction under a permit valid at the time it was issued—*as the government instructed it to do*[8]—does not suggest a likelihood of future unlawful conduct needing to be deterred. To the contrary, it suggests the opposite.

Third, the particular violation alleged here is unlikely to be repeated. Since the completion of the Comanche 3 Unit, the regulatory environment has changed yet again, with the federal government issuing uniform mercury emissions standards that apply to all new coal plants. Thus, if PSCo constructs a new coal plant in the future, it will no longer be subject to the case-by-case MACT determination provisions that WildEarth alleges were violated in this case. *Cf. Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162, 1176 (10th Cir. 2011) (en banc) (Gorsuch, J., concurring) (finding ordinance dispute moot because ordinance had been repealed).

---

[8] *See* Supp. App. at 101 (letter from Colorado Department of Public Health and Environment notifying EPA that "[c]onstruction of Unit 3 is proceeding under valid permits"); *id.* at 113 (letter from Colorado Department of Public Health and Environment to PSCo stating, "During this on-going administrative process, construction of Unit 3 is proceeding under valid permits."); App. at 62–63 (letter from Principal Deputy Assistant Administrator of the EPA to Regional Administrators "request[ing] that the appropriate State or local permitting authority commence a process under Section 112(g) to make a new-source MACT determination" for in-progress plants); *id.* at 64 (letter from Colorado Department of Public Health and Environment to PSCo, ordering PSCo to "supplement and revise your initial 112(g) determination [first submitted in 2005] . . . within ninety (90) days"); *id.* at 66 (letter from EPA to PSCo ordering it "to obtain a new source [MACT] determination and a schedule for coming into compliance with the requirements of Section 112(g)." At no point did any state or federal agency hint that PSCo was required to halt on-going construction.

In light of these circumstances, we conclude PSCo has demonstrated that its alleged unlawful conduct is not reasonably likely to recur. Because of this, WildEarth's claim for civil penalties, even if successful, would have no deterrent value, and would only serve the public's generalized interest in Clean Air Act compliance by power utilities. But "a general interest common to all members of the public" does not satisfy Article III. *Lance v. Coffman*, 549 U.S. 437, 440 (2007); *see Laidlaw*, 528 U.S. at 181; *Steel Co.*, 523 U.S. at 108–09.

### 2. *Supplemental Environmental Project*

WildEarth nonetheless argues that a live claim for civil penalties remains because, if PSCo is found to have violated the Act, the district court could award a Supplemental Environmental Project (SEP). As noted above, the citizen-suit provisions authorize courts to earmark up to $100,000 of any civil penalty they award to "be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment." CAA § 304(g)(2). WildEarth argues that even if civil penalties would not deter PSCo from future violations, a SEP could remedy the injuries it has suffered as a result of PSCo's mercury emissions.

Only a few courts appear to have addressed the question whether a SEP may save a Clean Air claim that would otherwise be dismissed for mootness or lack of standing. Most have rejected this argument based on the specific facts of the case before them, while acknowledging the theoretical possibility that a SEP request could support jurisdiction under different circumstances.

-23-

For example, in *Cambrians for Thoughtful Development, U.A. v. Didon Milling, Inc.*, 571 F. Supp. 2d 972 (W.D. Wisc. 2008), plaintiffs alleged defendant had violated filtering conditions in its permit. *Id.* at 978. The court first found deterrence to be an insufficient basis for standing because the defendant's circumstances had changed significantly, making future violations of a similar nature unlikely. *See id.* at 979–80. The court then addressed plaintiffs' argument that a SEP could support standing. The Court found:

> A mitigation project that proposes to remedy property damage or health consequences of defendant's past violations could redress plaintiffs' injuries. However, plaintiffs do not request such a project or even suggest that such injuries are identifiable. *A project that generally enhances the public health or environment is no more redress for plaintiffs' particular claims than a fine that generally encourages future compliance with the Act and benefits the undifferentiated public interest.* *Steel Co.*, 523 U.S. at 106. Plaintiffs suggest nothing more, identifying only a project to reduce air pollution, and a project to make information about air emissions . . . better available. Such projects do not effectively redress injuries to plaintiffs . . . to any greater degree than fines for wholly past non-compliance.

*Id.* at 981 (citations omitted) (emphasis added). Accordingly, the court found plaintiffs lacked standing. *See id.*

A similar result was reached in *Families for Asbestos Compliance Testing and Safety v. City of St. Louis*, 638 F. Supp. 2d 1117 (E.D. Mo. 2009). There, the plaintiffs' alleged injury was exposure to asbestos as a result of demolitions carried out by the defendant. *See id.* at 1119. Plaintiffs requested "an order directing defendant . . . to sample soil in the [potentially contaminated] area and to restrict public access to any areas found to be contaminated by asbestos." *Id.* at 1124–25. The court, however, found that

-24-

this relief would only achieve "a generalized public benefit." *Id.* at 1124. The evidence showed that soil testing would "not lead to a determination of whether plaintiff's members inhaled asbestos during the demolitions . . . [nor] allow for a determination of whether asbestos in the soil has been remediated." *Id.* at 1125. Furthermore, the court found "use restrictions will have no effect on [plaintiffs] as they continue to frequent an area that they already believe is unsafe." *Id.* Because the requested relief would not "alter the status quo . . . [or] confer any benefit on plaintiff or its members," the court found redressability lacking and dismissed the case. *Id.*

Finally, in *Anderson v. Farmland Industries, Inc.*, 45 F. Supp. 2d 863 (D. Kan. 1999),[9] the court found a potential SEP insufficient to support standing for two reasons. First, "plaintiffs [did] not request[] this relief in their complaint." *Id.* at 871 n.10. Second, "such relief would not remedy the injuries suffered." *Id.*

We have identified only one case in which a SEP was found sufficient to support standing: *United States v. LTV Steel Co., Inc.*, 187 F.R.D. 522 (E.D. Penn. 1998) (mem. order). There, a citizen group sought to *intervene* on the government's side in a Clean Air enforcement action. *See id.* at 524. The court found the Act's SEP provision was sufficient to sustain intervenor standing because it "provides for the establishment of a beneficial mitigation fund which could be structured to provide some measure of redress to [plaintiffs-intervenors] living or working in or near [the site of defendant's] alleged

---

[9] Although *Anderson* was decided before *Laidlaw*, the standard it applied was consistent with *Laidlaw*. *See Anderson*, 45 F. Supp. 2d at 872.

-25-

violations." *Id.* at 526. The court found *Steel Co.* distinguishable because the EPCRA citizen-suit provisions examined in that case did not include anything comparable to the Clean Air Act's SEP provision. *See id.* at 526 n.2.

We do not find *LTV Steel* persuasive, for several reasons. First, the *LTV Steel* plaintiffs specifically invoked the potential SEP in their motion to intervene, requesting "to participate . . . [in] the formulation of any Supplemental Environment Project (or 'beneficial mitigation project') that may be funded from any civil penalties imposed." *Id.* at 524. WildEarth made no such request before the district court. Second, the *LTV Steel* plaintiffs alleged specific injuries that concretely affected them; they "liv[ed] or work[ed] in the . . . neighborhood . . . where the [polluting] facility was located," and "must expend substantial sums to clean their houses and other property fouled by the emissions." *Id.* at 525.

Here, although WildEarth alleges that its "members live, work, and engage in outdoor recreation in areas that were affected by . . . [Hazardous Air Pollutants] emitted during [PSCo]'s noncompliance," Reply Br. at 19, they do not identify any actual or imminent injuries they have suffered or will suffer as a result of such emissions.[10] [*See*

_____

[10] In its complaint, WildEarth made only the conclusory allegation that its members "live, work, garden, and engage in outdoor recreation in areas that would be affected by" PSCo's mercury emissions. Compl., *supra*, at 4. While the complaint described many of the negative health effects of mercury exposure, it did not explain how mercury emissions had affected WildEarth's members specifically, as opposed to Coloradans in general. *Cf. Laidlaw*, 528 U.S. at 182–83 (describing changes in plaintiff's behavior precipitated by defendant's alleged Clean Air violations, and stating "environmental plaintiffs adequately allege injury in fact when they aver that they use the

Aplt. Br. at 19–20.] *See Laidlaw*, 528 U.S. at 181 ("The relevant showing . . . is not injury to the environment but injury to the plaintiff."). And because the MACT permit itself requires PSCo to *average* emissions over a full year, WildEarth cannot even show that the mercury emitted during the few months in which PSCo operated without a MACT determination was excessive in any practical sense. Accordingly, it is not clear how any mitigation project could possibly redress any injuries plaintiffs have suffered or will suffer.[11] And while forcing a defendant to conduct a SEP could deter it from future violations, as explained previously, no deterrent effect is reasonably possible here.

While we do not foreclose the possibility that a request for a SEP, in other circumstances, could save an otherwise-moot dispute, we find that it does not do so here. Significantly, WildEarth did not request a SEP in its complaint, and the only other injunctive relief it requested was for PSCo to halt construction until it obtained a MACT determination. And, as just described, WildEarth does not plausibly explain how a SEP would redress its ill-defined injuries, as opposed to merely advancing generalized environmental interests. Thus, WildEarth's request for a SEP, divorced from any

affected area and are persons for whom the aesthetic and recreational values of the area will be lessened" (internal quotation marks omitted)). It is also notable that any mercury emissions that occurred were limited by the mercury controls already installed pursuant to PSCo's settlement with environmental groups.

[11] The only specific SEP WildEarth suggests is for PSCo "to install solar panels on homes and community buildings in order to reduce the environmental impact of its excess emissions." Reply Br. at 22. We do not see how solar panels could redress injuries caused by PSCo's past mercury emissions—let alone any injuries suffered by WildEarth specifically.

cognizable deterrence interest, could not have supported standing at the start of this litigation, and cannot save the case from mootness now.

### 3. Injunctive Relief

WildEarth's claim for injunctive relief is also moot.  WildEarth asked the district court to enjoin "construction or operation of Comanche Unit 3 until and unless it complies with the Clean Air Act and any applicable regulatory requirements."  Compl., *supra*, at 10.  PSCo is now in full compliance with the Act and the relevant regulations; WildEarth's wish has come true.  Thus, WildEarth's request for injunctive relief is moot.

Seeking to salvage its claim for injunctive relief, WildEarth, in its Reply Brief, requests additional, wide-ranging injunctive relief "to further reduce [Hazardous Air Pollutant] emissions in Colorado."  Reply Br. at 20.  WildEarth claims "[t]he types of injunctive relief available in this case include requiring [PSCo] to halt operations for a limited period of time, to complete a [SEP], or to take affirmative action to mitigate the harm created by these excess emissions."  *Id.* at 21.[12]

This late request is unpersuasive.  WildEarth identifies no legal authority supporting such sweeping relief.  As relevant here, the Act's citizen-suit provisions, by their very terms, only give courts "jurisdiction . . . to enforce . . . an emissions standard or

---

[12] WildEarth suggests such affirmative action might include "paying for the testing of mercury in water bodies, to speed up the retirement of some of [PSCo's] older coal-fired power plants, or to take additional measures to reduce the amount of [Hazardous Air Pollutants] emitted from these plants."  Reply Br. at 22.  We note that PSCo, in its 2004 settlement agreement, has already promised to install additional pollution controls on its older coal plants.

limitation . . . and to apply any appropriate civil penalties." CAA § 304(a). PSCo is now in compliance with the applicable emissions standards and limitations, so there is nothing left to enforce. Insofar as the Act contemplates further relief, it is only in the form of a SEP stemming from any civil penalties recovered—the claim for which is moot, as discussed above.

In addition, WildEarth does not explain how further injunctive relief will redress its particular injuries, as opposed to the public's generalized interest in Clean Air Act compliance. *See United States v. Vera-Flores*, 496 F.3d 1177, 1180 (10th Cir. 2007) ("Where judicial relief will not remedy the appellant's injury, the appellant can no longer satisfy the Article III case or controversy jurisdictional requirement and the appeal is moot.") (internal quotation marks omitted).

Thus, WildEarth's requests for injunctive relief cannot save this claim from mootness.

### 4. Other Requested Relief

WildEarth's remaining claims are easily dispensed.

First, WildEarth seeks declaratory relief. Such relief is not an appropriate basis for standing except under special circumstances not present here, such as when a plaintiff is threatened with potential enforcement action. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 (2007); *see also Nova Health Sys.*, 416 F.3d at 1162 (Briscoe, J., dissenting).

Second, WildEarth seeks attorney's fees and legal costs. But "reimbursement of the costs of litigation cannot alone support standing." *Steel Co.*, 523 U.S. at 108.

Third, WildEarth requests "other relief as the court deems just and proper." Compl., *supra*, at 10. Such boilerplate requests for miscellaneous relief are highly disfavored. *See United States v. City of Las Cruces*, 289 F.3d 1170, 1181 n.10 (10th Cir. 2002) ("This court rejects the contention that a boilerplate prayer for 'necessary and proper relief' converts a declaratory judgment action into some other type of lawsuit."); *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1526 n.12 (11th Cir. 1994) ("The mere incantation of such boilerplate language does not convert a legal cause of action into a legitimate request for equitable relief."); *see also Frazier v. Simmons*, 254 F.3d 1247, 1254 (10th Cir. 2001) (cautioning that "a boilerplate recitation of 'just and equitable' relief included in one's prayer for relief is far from an exemplary request for prospective equitable relief," but allowing the claim to proceed because plaintiff's complaint as a whole "sufficiently indicated" a request for such relief).

WildEarth gives no indication that it sought below the type of equitable relief it now claims we have the power to grant. The only injunctive relief it specifically requested in its complaint was to enjoin construction until PSCo complied with the Act's MACT provisions. That request is now moot. A broad request for "other" relief cannot save the complaint in these circumstances.

# IV.  Conclusion

Because PSCo has shown that its alleged Clean Air violations are not reasonably likely to recur, WildEarth's suit can serve no cognizable deterrent purpose.  Thus, the case is moot.  Accordingly, we DISMISS this appeal as moot, VACATE the judgment of the district court, and REMAND the mooted claims to the district court with instructions to dismiss without prejudice.